Barbara FOX and Alan M. Lerner et al.

v.

The UNITED STATES HOUSING AND
URBAN DEVELOPMENT et al.

Civ. A. No. 75–445.

United States District Court,
E. D. Pennsylvania.

June 24, 1976.

Paul A. Coghlan, Harold R. Berk, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Walter S. Batty, Asst. U. S. Atty., Thomas D. Watkins, Redevelopment Authority, Philadelphia, Pa., for HUD.

James M. Penny, Asst. City Sol., Philadelphia, Pa., for City of Philadelphia.

MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This suit concerns itself with the urban renewal activities of the Department of

Housing and Urban Development, the Redevelopment Authority of the City of Philadelphia, and the City of Philadelphia, in a residential area of center city Philadelphia known as Washington Square West. The complaint frames a class action brought by four subclasses of present and former residents of the Washington Square West, Unit 2, Urban Renewal Area. The complaint alleges that urban renewal activities have had the effect of driving low and moderate income persons, predominantly non-white, out of the project area, thereby transforming a formerly racially and economically integrated community into a predominantly white, affluent community. Plaintiffs contend that an important contributing factor to this process has been the violation by the defendants of relocation procedures mandated by federal statutes and regulations.[1]

Presently before the court is plaintiffs' motion for class certification under Fed.R. Civ.P. 23(a) and 23(b)(2). The motion will be granted, as to all four subclasses. Certification of subclass I raises legal and factual issues which require discussion.

Subclass I is defined as:

"Present residents (owners and renters) of the Washington Square West, Unit 2, Urban Renewal Area who are not now scheduled to be displaced through urban renewal activities, who do not qualify for federally assisted low or low-moderate income housing, but who have moved into the Project Area or remained in the Project Area understanding and relying on the fact that the Project Area was comprised of a diverse and integrated racial and ethnic mix of people and who desire and intend to live in such an area; this subclass is represented by plaintiffs Fox, Lerner and Teaford."

The representative plaintiffs for subclass I allege a cause of action under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, et seq. Their standing to bring an action under this section is being challenged. The defendants also contend that proposed subclass I does not satisfy the numerosity and typicality requirements of Rule 23. The basis of the numerosity objection is that the size of the class cannot be estimated because its members are to be identified by a vaguely defined state of mind,[2] and therefore it is impossible to know whether "the class is so numerous that joinder of all members is impracticable." Rule 23(a). On the issue of typicality, defendants urge that the proposed representatives of subclass I have interests adverse to other members of the subclass and of all three of the other subclasses.

## STANDING

Defendants previously challenged this subclass on the grounds of standing in a motion to dismiss which was denied on June 26, 1975. We have allowed reconsideration of this issue because of the intervening Supreme Court decision in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The precise question for decision is whether *Warth* prevents plaintiffs from continuing to rely on *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) as a basis for standing. The plaintiffs in *Trafficante* were white tenants residing in an apartment complex. They were challenging alleged discrimination by the complex's owner against non-white persons seeking to become tenants there. The Court held that the plaintiffs suffered individualized injury[3] consisting of "the loss of

---

1. The complaint alleges causes of action under 42 U.S.C. § 1441, *et seq.* and the regulations promulgated pursuant thereto; 42 U.S.C. § 4601, *et seq.* and the regulations promulgated pursuant thereto; 42 U.S.C. §§ 1981, 1982 and 1983; 42 U.S.C. § 3601, *et seq.*; 42 U.S.C. § 2000d *et seq.*, and 5 U.S.C. § 551 *et seq.*

2. Paraphrasing the complaint, the class members are persons who "desire and intend to live in [an integrated] area," and who have moved

into the project area "relying on" the fact that it was such an area.

3. The two-pronged test for standing established in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) requires a) "individualized injury," and b) that the injury be to interests that are within the "zone of interests" protected by the statute or doctrine which the defendant allegedly violated.

important benefits from interracial associations." Further, the Court stated that Title VIII of the Civil Rights Act of 1968, was intended by Congress to be a far-reaching attack on discriminatory practices in the housing market,[4] and concluded that the Act extended standing to the fullest extent of the scope of Article III of the Constitution.

■ *Warth v. Seldin, supra,* was a suit challenging alleged unconstitutional exclusionary zoning practices by Penfield, New York, a suburb of Rochester, New York. The Supreme Court denied standing to five putative plaintiffs (or groups of plaintiffs). Plaintiff Metro-Act of Rochester was a nonprofit association dedicated to promoting open housing. Nine percent of its members were Penfield residents. In its decision denying standing to the association, the Court noted that these plaintiffs had not pleaded or argued a violation of Title VIII. Furthermore, the Court grounded its decision on the prudential, judicially created limitations to standing, without in any way criticizing its holding in *Trafficante* that Congress intended for standing under Title VIII to extend so far as Article III of the Constitution allows. 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d at 363–364. Implicit in the defendants' position is the argument that the prudential limitations on standing override Congressional intent (in passing Title VIII). *Warth* lends no support to this conclusion.

Moreover, *Warth* might be distinguished from the instant case on its facts. Throughout *Warth,* the Court stressed the attenuated nature of the cause and effect relationship that was said to connect the defendant's alleged unlawful practices to the plaintiffs' interests. It is particularly important that the association members who lived in Penfield were not alleging damage to their existing contractual or associational relationships, but that they were

harmed by being denied the opportunity to form new relationships. 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d at 364 n. 22.

In the instant case, subclass I plaintiffs allegedly have existing social relationships with persons in the other subclasses, and these relationships have been and are being damaged by defendants' allegedly unlawful conduct. If it were necessary for us to decide the question, we would be inclined to find that these allegations satisfied not only the constitutional limitations on standing, but also the prudential ones. But this much is clear, the allegation of damage to existing relationships satisfies the Article III requirement of individualized injury, and *Trafficante* eliminates any basis for challenging the standing of these plaintiffs on prudential grounds.

## NUMEROSITY AND TYPICALITY

■ Because the defendants' objections to certification on the grounds of numerosity and typicality raised disputed questions of fact, the court held an evidentiary hearing. Defendants produced no testimony; they introduced two documents into evidence. Plaintiffs offered several witnesses, but only one (Alan Lerner, Esquire) was permitted to testify,[5] because plaintiffs had not given notice to defendants of the identity of their witnesses, even though this information had been requested in interrogatories.

Mr. Lerner's testimony may be summarized as follows. He is an attorney who lives in the Washington Square West Project Area. He and his wife moved from the Germantown section of Philadelphia into the project area in April, 1968, and they had a child afterwards. He was a renter until Fall, 1975, when he purchased a house in the project area. He now lives there with his family. Lerner was primarily interested in the project area because he wanted to live and raise his child in a

---

4. For example, 42 U.S.C. § 3601 states that the policy of the Act is "to provide, within constitutional limitations, for fair housing throughout the United States."

5. Mr. John Kromer testified for the limited purpose of introducing three letters into evidence. Having reserved our ruling on the admissibility of the letters until this time, we now rule that they are inadmissible.

racially integrated area. Other factors which influenced his choice were the desirability of a center city location, and the "relative" inexpensiveness of sound housing in the project area, as compared to other center city areas.

For approximately six years Mr. Lerner has been an active member of the Washington Square West Project Area Committee. There are seventy-five to one hundred active members in the Committee. Since moving into the area Lerner has observed that buildings which housed large numbers of non-white, low income persons have been demolished, and that the former residents have had to move outside the project area because housing within their price range was not available in Washington Square West. Overall, he observed a sharp reduction in the proportion of non-white persons living in the project area. One of the main objectives of the Committee is to reverse the segregative trends in the neighborhood. Lerner estimated that he had heard at least one hundred project area residents express the view that the area should be racially integrated.

The cross examination was aimed at showing that Lerner had other motives for moving into the project area, aside from wanting an integrated community, and that he was financially benefited by the segregative trends. The increasing demand for housing in that area by relatively affluent persons, has caused property values to appreciate, including the value of Lerner's house. However, the defendants produced no evidence that Lerner has engaged in any commercially oriented real estate transactions in the project area. There is no reason to think that the appreciation in the value of his home will prevent him from vigorously representing the interests of persons who want to have an integrated community. This leads us to the same conclusion reached by the court in *Muth v. Dechert, Price and Rhoads,* 70 F.R.D. 602, at 604 (E.D.Pa.1976), where it found:

"We are not at all persuaded that there is any conflict of interest here, and even if one potentially exists, it is in no way ripe for resolution at this juncture by way of denying class certification."

In summary, the testimony shows that Subclass I includes a number of persons (at least 100) too numerous to be joined, and that there is no material conflict of interest between the representative plaintiffs and the members of any of the subclasses.

## ORDER

AND NOW, to wit, this 24th day of June, 1976, upon consideration of the plaintiffs' motion for class action certification, the briefs submitted by the parties, and the findings of fact incorporated into the accompanying Memorandum Opinion, it is hereby Ordered that this action may proceed as a class action under Fed.R.Civ.P. 23(b)(2) with the following subclasses:

### Subclass I

Present residents (owners and renters) of the Washington Square West, Unit 2, Urban Renewal Area who are not now scheduled to be displaced through urban renewal activities, who do not qualify for federally assisted low or low-moderate income housing, but who have moved into the Project Area or remained in the Project Area understanding and relying on the fact that the Project Area was comprised of a diverse and integrated racial and ethnic mix of people and who desire and intend to live in such an area; the subclass is represented by plaintiffs Fox, Lerner and Teaford.

### Subclass II

All black persons who have been forced to move from their former residences in the Project Area as a result of urban renewal activities and who have had to relocate outside of the Project Area into areas of minority racial concentration and who qualify for federally assisted low or low-moderate income housing; this subclass is represented by plaintiffs Shelton, Dingle and Lipscomb.

### Subclass III

All present and former tenant residents of the Project Area who have been tempo-

rarily or permanently relocated into inadequate or substandard housing and/or without adequate relocation assistance in violation of the Housing Act of 1949 and/or The Uniform Relocation Act of 1970 and their constitutional rights to life and property; this subclass is represented by plaintiffs Malone, Levison, Hornickel and Callahan.

*Subclass IV*

All low-income tenant residents of the Project Area who are faced with imminent or eventual displacement from their residences without adequate relocation assistance or replacement housing being made available to them in violation of their rights under the Housing Act of 1940 and/or The Uniform Relocation Act of 1970; this subclass is represented by Plaintiff Richard Apfelbaum.

It is further Ordered:

1) The plaintiffs' motion to amend the complaint is GRANTED.

2) The motion of defendant Frank L. Rizzo for judgment on the pleadings is DENIED.

AND IT IS SO ORDERED.