Barbara FOX et al.

v.

**The UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al.**

Civ. A. No. 75–445.

United States District Court, E. D. Pennsylvania.

Jan. 10, 1979.

Harold R. Berk, Community Legal Services, Philadelphia, Pa., for plaintiffs subclasses II, III and IV.

Alan M. Lerner, Philadelphia, Pa., for plaintiffs subclass I.

Alan Fellheimer, Edward Ellers, Philadelphia, Pa., for plaintiff objectors.

Walter S. Batty, Jr., Asst. U.S. Atty., Philadelphia, Pa., for HUD.

Nicholas J. Scafidi, Philadelphia, Pa., for Redevelopment Authority.

Morris H. Wolff, Philadelphia, Pa., for City of Philadelphia.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

The parties are presently before the Court requesting its approval of a settlement reached in this class action lawsuit. The lawsuit concerns urban renewal activities in the Washington Square West Area (Area) of the City of Philadelphia (City). After reviewing the terms of the settlement as set forth in the stipulation for Consent Decree and considering the arguments of the parties and the objectors, the Court has decided under Rule 23(e) of the Federal Rules of Civil Procedure to approve the settlement.

### BACKGROUND

This case has a long, but fascinating, pretrial history set in a bed of tensions generated by the nature of the parties and disputes involved. In December 1969, the original Washington Square West Project Area Committee filed an action (Civil Action No. 69–2972) against the United States Department of Housing and Urban Development (HUD) and the Redevelopment Authority of the City of Philadelphia (RDA) seeking to enjoin urban renewal activities in the Area due to an alleged lack of adequate citizen participation. HUD was charged with unlawfully refusing recognition of the plaintiff as the representative of the residents in the Area. A petition to intervene in the action was filed in January, 1970, by another group of Area residents, including the named plaintiffs in this action, who claimed that the original plaintiff was not an adequate representative; in addition the intervenors sought construction of housing for low and moderate income persons. The representation dispute was finally resolved by HUD recognition of a democratically chosen Washington Square West Project Area Committee (PAC).

Meanwhile, in January 1973, a second group of plaintiff-intervenors entered the 1969 filed lawsuit alleging that they had been displaced or faced displacement from the Area as a result of defendants' unlawful urban renewal activities; they sought to enjoin further displacement until suitable

replacement housing was provided for low and moderate income persons. On November 27, 1973, the 1969 filed action was reassigned to this Court and after a discussion with the parties where they recognized that certain issues were moot and certain parties were no longer interested in the action, the parties agreed to refile the complaint and dismiss the 1969 action. A new complaint was filed on February 14, 1975, officially commencing the above-captioned matter.

The newly filed class action was brought on behalf of present and former residents of the Area who alleged that defendants' urban renewal activities drove low and moderate income persons, predominantly nonwhites, out of the Area and transformed a formerly racially and economically integrated community into a predominantly white, affluent one. They sought relief under the Housing Act of 1949, 42 U.S.C. § 1455(c); the Uniform Relocation Act of 1970, 42 U.S.C. § 4601 et seq.; the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq.; the Fair Housing Act, 42 U.S.C. § 3601 et seq; the Fifth and Fourteenth Amendments, and the Philadelphia Ordinance of September 25, 1967.

Plaintiffs moved for certification of a class composed of four distinct subclasses:

I. PRESENT RESIDENTS (OWNERS AND RENTERS) OF THE WASHINGTON SQUARE WEST, UNIT 2, URBAN RENEWAL AREA WHO ARE NOT NOW SCHEDULED TO BE DISPLACED THROUGH URBAN RENEWAL ACTIVITIES, WHO DO NOT QUALIFY FOR FEDERALLY ASSISTED LOW OR LOW–MODERATE INCOME HOUSING, BUT WHO HAVE MOVED INTO THE PROJECT AREA OR REMAINED IN THE PROJECT AREA UNDERSTANDING AND RELYING ON THE FACT THAT THE PROJECT AREA WAS COMPRISED OF A DIVERSE AND INTEGRATED RACIAL AND ETHNIC MIX OF PEOPLE AND DESIRE AND INTEND TO LIVE IN SUCH AN AREA.

II. ALL BLACK PERSONS WHO HAVE BEEN FORCED TO MOVE FROM THEIR FORMER RESIDENCES IN THE PROJECT AREA AS A RESULT OF URBAN RENEWAL ACTIVITIES AND WHO HAVE HAD TO RELOCATE OUTSIDE OF THE PROJECT AREA INTO AREAS OF MINORITY RACIAL CONCENTRATION AND WHO QUALIFY FOR FEDERALLY ASSISTED LOW OR LOW–MODERATE INCOME HOUSING.

III. ALL PRESENT AND FORMER TENANT RESIDENTS OF THE PROJECT AREA WHO HAVE BEEN TEMPORARILY OR PERMANENTLY RELOCATED INTO INADEQUATE OR SUBSTANDARD HOUSING AND/OR WITHOUT ADEQUATE RELOCATION ASSISTANCE.

IV. ALL LOW–INCOME TENANT RESIDENTS OF THE PROJECT AREA WHO ARE FACED WITH IMMINENT OR EVENTUAL DISPLACEMENT FROM THEIR RESIDENCES WITHOUT ADEQUATE RELOCATION ASSISTANCE OR REPLACEMENT HOUSING BEING MADE AVAILABLE TO THEM.

The motion was granted on June 24, 1976. *See Barbara Fox v. United States Housing and Urban Development,* 416 F.Supp. 954 (E.D.Pa.1976).

On January 25, 1978, a Motion to Intervene as Defendants was filed on behalf of the Washington Square West Civic Association, Rosanne Forcina, Lee Lippman, Arlene Love, Florence McMenamin, Donna Maguire, Joseph A. Talvacchio and Theresa Talvacchio. The Motion was denied on April 25, 1978, upon finding that the intervenors' interests were adequately represented by defendants in this action, and that the motion was untimely.

During the course of pretrial proceedings, extensive discovery was conducted. For

over two years the parties attempted to reach settlement; finally, on July 13, 1978, they filed a Stipulation for Consent Decree and requested judicial approval. On July 20, 1978, the Court tentatively approved the settlement and the Notice of the Proposed Settlement. A hearing on the settlement was scheduled for August 11, 1978.

The only objectors to the settlement were members of Subclass I. At the August 11, 1978 hearing, some of them moved for a continuance, claiming that they had inadequate time to prepare for the hearing. A continuance until September 18, 1978 was granted and plaintiffs' attorneys were directed to make available to objectors' counsel prior discovery obtained in this case. When the hearing resumed on September 18, 1978, objectors again moved for an extension. Although the Court recognized that delaying the hearing burdened those persons who sought early implementation of the Consent Decree, it again continued the hearing until October 10, 1978, to permit objectors further discovery. Evidence on the settlement was taken on October 10, 1978, and again on October 30, 1978, when the hearing was concluded.

*The Terms of the Settlement*

The settlement provides for the construction or rehabilitation of 131 units of subsidized housing on certain properties within the Area that RDA presently owns; 111 units will be substantially rehabilitated and 20 units will be new construction. HUD will seek private developers of the units, and prepare a Developer's Packet consistent with the terms of the settlement which provides that consideration will be given to a developer's proposal if it suggests scattering the subsidized housing on various preapproved sites throughout the Area instead of concentrating the subsidized units in one or two locations. Prior to selection of a developer or developers, HUD will make available to plaintiffs, the PAC, RDA, and the City's Technical Evaluation Committee copies of all preliminary developers' proposals; these groups' comments on the proposals will be considered by HUD in designating

developers, if they are submitted to HUD within 30 days from the date that the proposals are made available to the parties and the PAC.

The settlement is funded under what is commonly known as the Section 8 program, 42 U.S.C. § 1437f, which is designed to allow low and low-moderate income persons to live in privately owned housing. Under the program, tenants pay no more than 25% of their income for rent, and HUD pays the private owner of the housing the remainder of the rent up to fair market value. In this case, present tenants of RDA who are eligible for subsidized housing under Section 8 will be given first priority to the 131 units; persons who have been identified as being relocated and desiring to return to the Area then will be given preference. The names of the persons who are to be given priority are listed in exhibits to the Consent Decree. If these lists are exhausted, then the private owners may lease the units to other persons who meet Section 8 eligibility criteria.

The agreement also requires HUD to review the City of Philadelphia's Innovative Grant Proposal and determine whether it will fund a community based nonprofit corporation in the Area. If HUD decides not to, the City, if requested by the PAC, will provide up to two-thirds of the amount requested from HUD to fund this corporation.

Although not mandated by this settlement agreement 300 units of additional Section 8 housing are soon to be constructed by the Postal Workers Union for the elderly and handicapped. This settlement agreement requires RDA to assist members of Subclasses II, III and IV who are eligible for and desire to live in the Postal Workers' project in completing applications and obtaining necessary papers to accompany the application. In addition, RDA must notify subclass members who are eligible to live in that development of the availability of that housing and the terms of rental subsidies.

The subclass members' claims for relocation payments are preserved under the settlement agreement. Each party is to bear

its own costs including but not limited to attorney fees. Upon approval of the Consent Decree, the matter is to be dismissed with prejudice.

*Standards for Evaluating a Class Action Settlement*

■■■ Before approving a settlement of a class action, the Court must determine that the settlement is fair, adequate and reasonable. *Sommers v. Abraham Lincoln Federal Savings & Loan Association*, C.A. 72–2269 (E.D.Pa. filed July 9, 1978); *Dunn v. H. K. Porter Co., Inc.*, 78 F.R.D. 50 (E.D. Pa.1978). To render such a determination, the Court is required to consider and balance certain factors which include:

" ' . . . the complexity, expense and likely duration of the litigation . . ; the reaction of the class to the settlement . . . ; the stage of the proceedings and the amount of discovery completed . . . ; the risks of establishing liability . . . ; the risks of establishing damages . . . ; the risks of maintaining the class action through the trial . . . ; the ability of the defendants to withstand a greater judgment . . . ; the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . ." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

Often, the most significant consideration in judging the adequacy of the settlement is the strength of plaintiff's case in achieving what is sought balanced against what is offered in the settlement. *Somers v. Abraham Lincoln Federal Savings & Loan Association, supra.*

But conducting such a balancing in this case is difficult. The four different subclasses do not possess exclusively one goal or set of goals. They share some interests, and maintain others that are distinct. Nonetheless, surely the development of decent, safe, sanitary and adequate housing in the Area sufficient to house all residents and former residents of the Area displaced or to be displaced by urban renewal who desire to return or remain in the Area would satisfy the major interests of Subclasses II, III and IV. On the other hand, it is not clear that this relief would sufficiently redress Subclass I's alleged injury or be one that its members would seek to obtain in this litigation. Subclass I's claim is under the Fair Housing Act, and, it allegedly has been deprived of its right to live in a racially and economically integrated Area; although the relief sought by the other subclasses might remedy the injury suffered, it might be inadequate. Therefore, in considering this settlement, the Court first will examine the settlement to see if it is fair, adequate and reasonable to Subclasses II, III and IV, and then conduct the same inquiry with respect to Subclass I.

*The Settlement and Subclasses II, III and IV*

To assess the settlement's reasonableness in light of these plaintiffs' goal of developing decent housing in the Area sufficient to satisfy the needs of all persons displaced or to be displaced by urban renewal and desiring to return or remain in the Area, the Court first will look to plaintiffs' chance of achieving their goal through a trial on the merits.

■■■ Turning to claims asserted under the Housing Act of 1949, 42 U.S.C. § 1455(c) et seq., and the Uniform Relocation Act of 1970, 42 U.S.C. § 4601 et seq., it appears that if plaintiffs are successful in proving their claims they will be entitled to the broad relief they seek. However, they may encounter some difficulty in achieving success on the merits. The Housing Act and the Uniform Relocation Act require the federal government when contracting with local agencies or acquiring real property under an urban renewal program to insure that the contract or program provides for replacement housing, prior to displacement; the replacement housing must be located in the urban renewal area or in areas generally not less desirable in terms of public utilities and public and commercial facilities and it must be available at rents or prices

that the displaced persons can afford. In addition, the Acts specify that the replacement housing must be decent, safe and sanitary, reasonably accessible to the displaced persons' places of employment and equal in number to the persons' displaced. An individual who has been displaced in contravention to the requirements of the Acts, can seek judicial review of the agency's actions, *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2nd Cir. 1968), and arguably, would be entitled to the type of relief plaintiffs seek.

Plaintiffs contend that no other area within the City of Philadelphia that offers housing to dislocatees at affordable prices is comparable to the Washington Square West Area and therefore, that any dislocation from the Area violates the Acts. Additional violations of the Acts are asserted based upon the replacement housing's alleged failure to meet the decent, safe and sanitary standards imposed by the Acts.

Plaintiffs will easily establish that persons were displaced to areas other than Washington Square West. Defendants' answers to interrogatories indicate that between 1504 and 1923 households were removed from the Area by the defendants' urban renewal activities and that only 95 were relocated within the Area.

Proving that all other affordable areas within the City are less desirable than Washington Square West will present more difficulty. Plaintiffs have not presented any direct evidence which supports their allegations. Nonetheless, it should be noted that defendants have never determined that comparable areas exist within the City. In fact, at the settlement hearing, Michael Arno, acting director of the RDA, testified that with regard to housing and transportation he believed that other areas within the City were comparable to Washington Square West, but in terms of cultural activities, none existed. The limited evidence presented on this issue does not permit the Court to determine whether proof of this element is possible; however, the risk certainly exists that plaintiffs will not succeed on this issue of fact and obtain an order requiring replacement housing within the Area.

As to plaintiffs' charges that the housing provided does not meet the decency standards of the Act, it appears that plaintiffs might in part, prove these allegations. A study plaintiffs conducted allegedly indicates that 52% of displacees surveyed are not living in safe, decent and standard housing. But, even if plaintiffs establish that certain housing is inadequate, they will not necessarily be entitled to housing within the Washington Square West Area, unless they can also show that standard housing in other areas is less desirable than such housing in Washington Square West. Therefore, plaintiffs' chances of achieving the "ultimate goal" of decent, safe and standard housing *within* the Area again rests on whether they will be able to prove that no area within the City is comparable to Washington Square West; as noted above, this is risky.

And yet, it should be recognized that even if plaintiffs are unable to prove that no area is comparable to Washington Square West, they still might be able to secure relief which they would find favorable. For example, if plaintiffs establish that the housing provided is not decent, safe and adequate, the Court may require defendants to erect housing that meets the statutes' requirements, albeit, not necessarily in the Washington Square West Area. The possibility of receiving such beneficial relief must also be weighed when evaluating the settlement.

Plaintiffs also seek relief based on two other sections of the Housing Act of 1949: 42 U.S.C. § 1455(f), § 1455(h). Their applicability to this action is highly doubtful, as their requirements are only imposed if HUD recognized the relevant area as an urban renewal area after a certain date; in this case, HUD did not. Plaintiffs contend that certain amendments to urban renewal contracts waived the statutory time limits; this argument has been rejected by the only court ruling on the issue. *Marin City Council v. Marin County Redevelopment Agency*, 416 F.Supp. 700 (N.D.Cal.1975).

Another act plaintiffs invoke for protection is the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* This Act authorizes HUD grants to states and local governments which help finance community development programs; the grant application must describe a program designed, *inter alia*, to "eliminate or prevent slums, blight and deterioration where such conditions or needs exist," and to "improve conditions for low- and moderate-income persons residing in . . . the community." 42 U.S.C. § 5304(a)(3). In addition, a 1977 amendment requires the local authorities' submission of a housing assistance plan which includes provision for "a reasonable opportunity for tenants displaced as a result of [community development] activities to relocate in their immediate neighborhood." 42 U.S.C. § 5304.

■■ Recognizing that affected individuals have standing to challenge HUD's approval of a grant application under the 1974 Act, *See Coalition for Block Grant Compliance v. Department of Housing and Urban Development*, 450 F.Supp. 43 (E.D.Mich. 1978), the courts have limited their inquiry to whether the agency action "was arbitrary, capricious, or an abuse of administrative discretion, or otherwise not in accordance with [the] law." *N.A.A.C.P.–Santa Rosa-Sosoma County Branch v. Hills*, 412 F.Supp. 102, 108 (N.D.Calif.1976). Even though proving a claim under this standard may be difficult, from the evidence presented it appears plaintiffs may succeed. They claim and the evidence tends to indicate that while defendant City has received funds under the Act since 1975, it has failed to meet the Act's requirements. But, even if they meet their burden, the important question will be to what relief are plaintiffs entitled. Because the grants were received after 1975, any relief would be limited to persons affected by the City's activities after that time. And in cases where relief has been granted under this statute, the only relief complaining parties have been awarded is an injunction prohibiting the further dispersement of grant funds until the agency meets the Act's requirements. *See e. g. Coalition for Block Grant Compliance v. Department of Housing and Urban Development, supra.* Undoubtedly in this case, where funds have been dispersed for three years, such limited prospective relief might be insufficient and some type of broader affirmative action appropriate. Nevertheless, the Court seriously doubts that plaintiffs would be entitled to the relief they seek, i. e., an order requiring defendants to provide adequate housing within the Area to all displacees. Until 1977, under the Act, defendants did not even have a duty to provide displacees with a *reasonable opportunity* to be relocated within the Area; it appears improbable, then, that the relief requested is mandated by the Act. Also, prior to 1977, the local authorities were required to seek improvement of the housing conditions of low and moderate income persons, but were not insurers of adequate housing within the Area. Therefore, even if plaintiffs are successful, it is unlikely that they will achieve their goal, although, again, it is possible they will obtain other beneficial relief.

Plaintiffs seek redress under a 1967 Philadelphia Ordinance which created the urban renewal Area and obligated the City to provide low and moderate income housing within the Area. Section 12 of Philadelphia Bill 2248–A provides:

New construction for low and moderate income housing shall first be completed and made available to persons to be displaced by Authority action, which new construction shall precede any other displacement activity in the Project Area, or that other decent, safe and sanitary housing within the Project boundaries be made available with the minimum of hardship and with adequate provision for assistance in effecting such relocation.

It appears that only the local defendants' liability could be affected by this ordinance. In addition, if the case went to trial, there would be an issue as to whether a private right of action can be implied under the Ordinance. If it can and plaintiffs can prove that defendants failed to meet the Ordinance's requirements, then the broad relief that plaintiffs seek perhaps would be

proper to remedy the breach of the Ordinance. Nevertheless, the issues are not determined, and plaintiffs risk achieving success if they go to trial.

Plaintiffs' remaining claims are brought under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq.; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Fifth and Fourteenth Amendments. Defendants' are alleged to have engaged in racial discrimination and plaintiffs seek equitable relief for the violation of their civil rights.

■ Of all the civil rights claims alleged, the Fair Housing Act one is the easiest to prove, for plaintiffs need not show under that Act that defendants' discriminatory acts were done intentionally. *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499 (1978). To establish the Fifth and Fourteenth Amendment claims, plaintiffs would be required to prove purposeful discrimination. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). And as to plaintiffs' Title VI claims, it is not clear, after the recent decision in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), whether plaintiffs must prove intentional discrimination to succeed. Therefore, as this Court is most interested in finding out how likely it is that plaintiffs would secure relief on their racial discrimination claim, it need only evaluate the strength of the Fair Housing Act claim.

■ A prima facie case under the Fair Housing Act is established by proof that the defendants' "acts had a discriminatory effect and that the [defendants] failed to justify the discriminatory results of their actions." *Resident Advisory Board v. Rizzo, supra* at 146. Plaintiffs contend that the overall effect of defendants' activities has been to reduce integration in the Area and to displace blacks to racially concentrated neighborhoods. The Court finds that a substantial likelihood exists that plaintiffs will prove their case.

In answers to interrogatories, HUD admits that from the date of HUD recognition of Washington Square West in 1968 until June 30, 1976, 127 of the 336 families relocated, or 37.8% were non-white. Of the 1570 additional individuals relocated during that time, 241 or 15.3% were non-white. On the other hand, in 1970 the percentage of non-white residents in the two census tracts that comprised the Area constituted 13.3% of the total population and in 1975, non-whites in the two tracts were 11%. These figures suggest that the dislocation of non-whites was disproportionate to their presence in the community and that they were dislocated disproportionately to whites. In addition, and not surprisingly, it seems that between 1970 and 1975, the percentage of non-whites in the community decreased. From the evidence presented, plaintiffs appear to have a good chance of proving that the effects of defendants' urban renewal activities were discriminatory. At this time, defendants have not put forth a justification for their conduct, but of course, there has not been a trial. Therefore, although plaintiffs' Fair Housing claim seems strong, success is not certain, especially when the case has not been presented from an adversary position.

If plaintiffs prove their Fair Housing claim, relief would appear limited to providing housing in the Area for those non-white dislocatees who wished to return to the Area. *Garrett v. City of Hamtramck*, 503 F.2d 1236 (6th Cir. 1974). It is not clear in this case how many persons would fall into that category, but nevertheless, surely that would be less than the ultimate relief sought by Subclasses III and IV which seek sufficient housing for all displacees—whites and non-whites—who wish to return to the Area.

Having then reviewed the merits of plaintiffs' claims, the Court believes that plaintiffs' chances of obtaining at trial decent housing within the Area sufficient to house all dislocated persons who wish to return to the Area are not great; however, it is very likely that a substantial number

of subsidized housing units within the Area would be required at a trial's conclusion. The civil rights claims appear especially strong, and success may entitle plaintiffs to housing for all non-whites displaced from the Area who desire to return. Additional units within the Area for white displacees might be required under the Housing Act of 1949 and the Uniform Relocation Act. Other claims, of course, might yield further relief.

This settlement provides for the construction of 131 units of subsidized housing that will be made available to persons displaced or to be displaced by urban renewal activities in the Area. Three hundred units of subsidized housing in the Postal Workers Union Building also will be available to the elderly and the handicapped. Although these additional units are not reserved for persons displaced from the Area, it is reasonable to assume that some dislocatees will be housed there. But even if the 300 units were added to the units made available pursuant to the settlement, a substantial likelihood remains (given just the number of non-whites displaced) that if the case proceeded to trial on the merits, plaintiffs would achieve more housing units within the Area than they do under the settlement.

Nevertheless, the Court is convinced that other factors render this settlement reasonable and fair to subclasses II, III and IV, the most important being that it allows this case to proceed to a speedy resolution. This lawsuit was commenced in 1969 and plaintiffs have been without relief since before that time. If the case went to trial, undoubtedly, it would take several months to be presented. Although securing as speedy relief as possible is crucial given the nature of the claims involved, relief would be indefinitely prolonged if the case went to trial.

There are other indications that this settlement is reasonable. No member of Subclasses II, III and IV has objected. Counsel for all parties are experienced in this area of law and their opinion that the case should be settled indicates that the settlement is fair. The attorney for Subclasses

II, III and IV has litigated other major housing cases, knows the difficulties of proof and the probabilities of obtaining the ultimate relief sought; his judgment is respected by the Court. In addition, the Court witnessed the vigorous litigation of this lawsuit, in discovery and in settlement negotiations; it is convinced that the settlement was arrived at by arms-length negotiations and that counsel for Subclasses II, III and IV strenuously sought to protect the interests of his clients. Given these factors, the Court concludes that even though the settlement may provide Subclasses II, III and IV with less than they otherwise would obtain through trial, it is fair, adequate and reasonable and worthy of the Court's approval.

*The Settlement and Subclass I*

Unlike the other subclasses, some members of Subclass I voiced vigorous objections to the settlement. After reviewing the factors articulated in *Girsh v. Jepson, supra,* and the objections presented, the Court is convinced that this settlement is fair, adequate and reasonable to Subclass I members.

Evaluating the settlement as it relates to Subclass I presents certain problems because of the nature of the subclass. Although members of Subclass I must possess certain objective characteristics, membership also turns upon subjective criteria which renders it difficult to determine exactly who is a member of the subclass. Besides being a resident of the Area who is not subject to being displaced through urban renewal activities and is ineligible for federally assisted low or low-moderate income housing, a Subclass I member must maintain a specific "state of mind"; that is, the subclass member must have moved into the Area "understanding and relying on the fact that the project area was comprised of a diverse and integrated racial and ethnic mix of people and [must] desire and intend to live in such an area."

At the settlement hearing, plaintiffs argued that some of the objectors did not possess the state of mind required of Sub-

class I members and therefore, lacked standing. Limited examination of the challenged objectors was permitted for the purpose of resolving the standing issue. It became clear that although all questioned objectors stated that they desired and intended to live in an integrated area, at least one objector did not believe that additional low income housing should be permitted in the Area or that this lawsuit was a proper method for achieving integration in the Area. The Court denied this objector—Steven Stone—standing.

A Subclass I member must not only meet the definitional requirements of the class, but also must assert the claim of the class, that is, a claim under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* A non-minority member's right to proceed under this Act was established by the Supreme Court in *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). There the Court found that a white person stated a claim under the Fair Housing Act when he alleged that the Act was violated and that he was harmed by the defendant's denial of housing to minority persons; the loss of the "important benefits from interracial associations" was sufficient injury to confer standing upon the non-minority plaintiff. In that case, the plaintiff sought integration of an apartment complex. Here, Subclass I alleges in its amended complaint that defendants' actions deny them the opportunity and right to live in a racially and economically integrated Area and they pray that defendants be ordered to take affirmative action, including the development of subsidized housing within the Area, to remedy the injuries defendants' conduct has caused. Given the basis for Subclass I's claims and the remedy sought, the Court cannot accept that an individual who does not believe that additional low income housing should be permitted in the Area or that it is proper to seek integration through this lawsuit is a member of Subclass I. To the contrary, Subclass I members must assert that the defendants' activities have caused segregation and that this lawsuit is the proper tool to remedy that unlawful activity.

Therefore, as was the case with the other subclasses, it is important in determining whether the settlement is reasonable to evaluate Subclass I's chance of proving its case and the possible remedies it may secure if successful. From the examination of the other subclasses' chances of achieving success on the Fair Housing Act claims, it seems that a strong likelihood exists that defendants' activities will be shown to have had a racially discriminatory effect and to have further segregated the Area. If Subclass I was to prove a Fair Housing Act violation, what would be the remedy? One possibility would be to order defendants to provide housing within the Area to all non-whites displaced or to be displaced by urban renewal activities who wished to return or remain. The data supplied by the parties indicates that this could involve nearly 370 housing units. Of course, some non-white displacees might not wish to return to or remain in the Area, and this would decrease the number of units required. On the other hand, perhaps plaintiffs would be afforded further relief. If the number of non-white displacees wishing to return to the Area was insufficient to recreate the integration balance existing prior to defendants' activities, defendants might be required to provide additional units to non-whites, even though these non-whites lacked prior contacts with the Area.

Determining the exact number of housing units required to redress Subclass I's injuries is difficult, but success at trial should guarantee Subclass I that sufficient subsidized housing within the Area would be constructed to remedy the situation created by the dislocation of low or low-moderate income non-whites from the Area. Although the settlement provides for the development of 131 units of Section 8 housing, there is no assurance that all or any of the Section 8 housing will be afforded to non-whites; rather the requirements for the housing are economic. Perhaps, it is reasonable to assume that non-whites will occupy a substantial number of the units. But whatever that number is, it possibly is

substantially less than that which would be obtained by continuing this litigation.

And yet, the Court finds that the settlement is reasonable. There is no guarantee that Subclass I will achieve success at trial and the settlement affords Subclass I members the opportunity to live in the type of Area they seek at any earlier time than otherwise possible. As noted earlier, if this litigation proceeds, the complexities will increase and trial can be expected to last several months. Receipt of the benefits now obtained by the settlement would be delayed indefinitely. Finally, it should be noted that none of the objectors argue that the settlement provides for too few units.

Presently, before the Court are the objections of four individuals—Nada Chandler, Howard Baker, Kathleen Cushing, Lee Lippman, the Greek Orthodox Cathedral, and a community group—Washington Square West Project Area Committee (PAC); at the hearing, the PAC was represented by Milton Hollander.

Although PAC registered its objection to the settlement, this does not mean that all Subclass I members oppose the settlement. Any resident or property owner in Washington Square West is considered to be a member of the PAC and a vote of the PAC is only the vote of the persons attending the general membership meeting. The vote on the settlement was held on August 3, 1978, and 68 of the 94 persons present voted against it. What that vote tells the Court about Subclass I's sentiments is unclear. As membership in Subclass I depends upon possessing a requisite state of mind, not every member of the PAC is necessarily a member of the subclass.[1] Therefore, all that can be conclusively understood by the PAC's objection is 68 Area residents or property owners oppose the settlement. While this may be significant, in that *possibly* 67 Subclass I members oppose the settlement, it is not persuasive evidence that the settlement is unfair, inadequate or unreasonable.

Turning, then to the specific objections, PAC, Lippman, Cushing and Baker object to the number of housing units to be constructed pursuant to the settlement. Their complaints are that the settlement provides for too many units and that insufficient data is available to conclude that 131 is a "proper" number of units. Although the Court agrees that it does not know whether 131 is a "proper" number, the number of non-white households known to have been displaced from the Area by urban renewal activities indicates that 131 subsidized housing units, all of which are not guaranteed to be occupied by non-whites, are not "too many" to satisfy the interests of persons concerned with securing the formerly existing integration of the Area. Nor does the number of units appear to be "too many" or "improper", even when one considers that 300 additional subsidized housing units will be available at the Postal Workers Union Building. These units will not necessarily be provided to non-whites or insure the reestablishment of the previously existing racial balance.

With the exception of the Greek Orthodox Cathedral, all objectors criticize the settlement for insufficiently scattering the Section 8 housing. Surely, this is a legitimate concern of persons seeking to integrate their area. Under the settlement, Section 8 housing will be more concentrated on certain streets than on others; nevertheless, there appears to be a sufficient amount of other types of housing on these streets and on the adjacent streets to prevent ghettoization. Although the objectors did not present evidence on this issue, they ask this Court to substitute their unsupported opinion to the contrary for that of counsel; the Court cannot do this, especially when counsel's opinion appears reasonable.[2]

---

1. In fact, Steven Stone who was found by this Court not to have standing, attended and actively participated in the PAC meeting on August 3, 1978.

2. Even though the Court would not feel free to substitute its judgment for that of counsel, it did tour the Area, unaccompanied by the parties, and is satisfied that the housing plan agreed to by the parties sufficiently scatters the Section 8 housing to protect the interests of Subclass I.

Nada Chandler's objection is somewhat more specific than the other objectors. She believes that the agreement is inadequate because it does not state an absolute preference for developers who limit the number of Section 8 units on certain parcels to fifty percent. The parties contend that imposing this limitation would unduly restrict the developers and prevent consideration of more desirable ways in which to distribute the 131 units. These considerations sufficiently justify the absence of an absolute preference clause, especially since the agreement states a preference for developers who scatter Section 8 housing. Objections on the basis of lack of scattering will be overruled.

Another objection raised by Chandler involves the community non-profit corporation that is discussed in the settlement. Chandler believes that the settlement does not indicate sufficient commitment by the parties to this organization. Presumably, the organization's purpose is to help the new residents in the community adjust to the Area and to insure that their needs, especially in the social services area, are satisfied. The settlement provides that if HUD decides not to fund the organization, the City will supply two-thirds of the monies requested from HUD. The Court believes that this is a reasonable agreement that aids the integration process. Requiring additional support, would unduly interfere with the settlement process.

A major objection of the PAC, Lippman, Cushing and Baker was the alleged lack of community participation in the settlement negotiations and the parties' inattention to the wishes of the community. The Court finds this objection without merit. The parties were under no legal obligation to seek community feedback on the settlement question, and yet they always did. During the years in which the settlement was negotiated, persons whose status was only based on community membership were allowed to attend negotiating sessions and give their opinions on proposals. Counsel for all subclasses attended many PAC meetings, discussed settlement proposals and sought the PAC's views. Late in the negotiations, the

parties informed the PAC that they had agreed on 131 subsidized units and asked the PAC to express its view as to the units' locations. The objectors complain that the community's freedom was unjustly infringed when the parties settled upon 131 units; however, although the PAC's options were limited, the parties were clearly within their rights when they finally resolved this issue on which, over the years, they had constantly sought the PAC's advice. Similarly, even though the parties disagreed with the PAC as to the units' location, this does not mean that the community was denied adequate participation in the settlement process. The ultimate settlement agreement had to be reached by the named parties and their counsel and the consideration they gave to the PAC's and the community's wishes appears to have been generous.

Cushing, Lippman and Baker complain that they had insufficient time to prepare for the settlement hearing. The hearing was twice continued to allow for discovery and it was finally concluded two and a half months after it was scheduled to be held. Any further continuance would not have been justified.

These objectors also allege that the settlement was based upon insufficient information and discovery. The parties have conducted an enormous amount of discovery over the nine years of litigation. They do not have the answer to every question put forth by the objectors, but sufficient data exists to allow them to evaluate their claims and arrive at a reasonable settlement. Objectors claim that the discovery is inadequate for it has not been determined how many units are necessary to achieve a "proper racial and economic balance." This is not the standard upon which a settlement is based nor one for conducting discovery. The discovery in this case has been directed at revealing the effects of defendants activities on integration in the Area and the remedies for those effects. This seems proper and adequate.

Cushing, Lippman and Baker contend that the settlement should not be accepted because they allege Subclass I's counsel has inadequately represented their interests. The Court disagrees and its reasons are stated in an October 30, 1978 Order denying objectors' Motion to Remove Counsel. These objectors also allege that the settlement was not arrived at by arms-length negotiations. The Court finds no evidence to support these allegations. The parties represent varied interests and have always taken a strong adversary position in this litigation. There is no reason to believe that any party unduly compromised its position, even though all eventually reached an accord.

Cushing, Lippman and Baker object to the settlement on the basis that it is unlikely that Subclasses II, III and IV would win their case. First, the Court, as noted earlier, disagrees with the assertion. Second, and more importantly, the Court does not believe that this fact, if it were a fact, would be a basis for finding the settlement unfair to Subclass I. It is only Subclass I's chances of success with which the Court is presently concerned.

Milton Hollander also quarrelled with certain specific aspects of the settlement agreement. First, he found it objectionable that the PAC Design Selection Criteria will not have input in the Developer's Packet; however, Hollander did not explain what the Design Selection Criteria was and how its exclusion rendered the settlement unfair or inadequate. Second, he objected to the limited time that the plaintiffs and RDA will be given to review and comment upon the Notice of Fund Availability and the Developer's Packet prepared by HUD, i. e. 2 days. Under the settlement agreement, though, the plaintiffs, the PAC, the RDA, and the City's Technical Evaluation Committee are allowed 30 days to submit comments upon the proposals of developers; this appears to provide interested parties sufficient time and opportunity to express their views. Hollander also complained that this comment period is meaningless; the Court disagrees. Although these groups' opinions are advisory only, their expression allows HUD to be aware of community sentiment which presumably will be important to the HUD decision. The notice and comment decision-making process that the settlement provides for is common to federal agency action. Unless one completely rejects the usefulness of that process, it can not be found "meaningless" here. The final objection raised by Hollander is that "there is no provision for input from Project Area Committee in a consolidation plan for tenants remaining in Redevelopment Authority properties." As he did not explain this objection and its effect upon the settlement, the Court must disregard it in making its determination.

Because the Greek Orthodox Cathedral is not named as a developer in the settlement, the Cathedral objected to the settlement. This objection is improper as it does not relate to the settlement's fairness.

In conclusion the Court overrules all objections to the settlement and will render its approval of the Stipulation for Consent Decree. The settlement may not be the resolution that each subclass member would choose, or for that matter the one that the Court would select, but it does meet the requirements for judicial approval. It is the hope of the Court that the objectors and the remaining community will also accept the settlement as fair and act accordingly.