**ARBOR HILL CONCERNED CITIZENS NEIGHBORHOOD ASSOCIATION, Plaintiff,**

**v.**

**CITY OF ALBANY, NEW YORK; Gerald Jennings, in his official capacity as Mayor of Albany; Department of Development and Planning; George Leveille, in his official capacity as Commissioner of the Department of Development and Planning; Albany Community Development Agency; and Joseph Montana, in his official capacity as Director of the Albany Community Development Agency, Defendants.**

**No. 02–CV–1016.**

United States District Court, N.D. New York.

March 17, 2003.

Natural Resources Defense Council, Inc., Attorneys for Plaintiff, New York City, Michelle B. Alvarez, Nancy S. Marks, Lawrence M. Levine, Of Counsel.

Marc S. Gerstman, Albany, NY, Gary S. Bowitch, Castleton–on–Hudson, NY, for Plaintiff.

Nixon Peabody, LLP, Attorneys for Defendants, Albany, NY, Sheri L. Moreno, Frank L. Amoroso, Robert S. McEwan, Of Counsel.

Office of Corporation Counsel, City of Albany, Department of Law, Albany, NY, Gary F. Stiglmeier, Of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Arbor Hill Concerned Citizens Neighborhood Association ("plaintiff"),

pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619(a)(1)(B), brought suit against defendants, alleging various violations of federal regulations governing lead-based paint activities, *see infra,* and seeking injunctive and other relief. Defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff opposes. Oral argument was heard on January 24, 2003, in Albany, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

The following are the facts relevant to this motion, taken from plaintiff's Complaint, or, where undisputed, from the moving papers.

### A. PARTIES

Plaintiff "is an unincorporated, not-for-profit association of residents who live in the Arbor Hill neighborhood, adjacent to downtown Albany[, New York]. For more than twenty years, [plaintiff] and its members have worked to protect and improve the quality of life and public health of the community." (Complaint, Docket No. 1, ¶ 10).

Defendant City of Albany, New York is a municipality in New York State that has received federal grant money to develop a program aimed at reducing lead-based paint hazards in low-income housing within its city limits. Defendant Gerald Jennings was, and is, the Mayor of the City of Albany at all times relevant to this lawsuit.

Defendant Department of Development and Planning is a department within the City of Albany's Division of Housing and Community Development. Defendant George Leveille is its Commissioner.

Defendant Albany Community Development Agency is responsible for housing-related activities in the City of Albany, and played a substantial role in the lead-based paint hazard abatement program. Defendant Joseph Montana is its Director.

### B. BACKGROUND AND ALLEGATIONS

The hazards of exposure to lead are well documented by plaintiff. "Lead is highly toxic and can affect virtually every organ and system in the body, particularly the central nervous system. At high levels of exposure, lead can severely damage the brain and kidneys in adults and children, causing miscarriage, and damage [to] reproductive organs." (Complaint, Docket No. 1, ¶ 27). Children are especially vulnerable to lead poisoning, which in them can lead to serious health complications, or where their exposure levels are lower, to other physical and mental problems. (*Id.* at ¶ 28). In fact, "childhood lead poisoning is the most common environmental disease of young children, eclipsing all other environmental health hazards found in the residential environment." (*Id.* at ¶ 26). "[Housing and Urban Development] has determined that lead-based paint in housing is the major remaining source of exposure and is responsible for most cases of childhood lead poisoning today." (*Id.* at ¶ 30). The inspection, risk assessment, and analysis of lead hazards are heavily regulated, as are those performing such tasks. (*Id.* at ¶¶ 18–25).

Government officials "ha[ve] determined that the most severe lead poisoning problem in Albany County is in the census tracts for the Arbor Hill, West Hill and South End sections of the City of Albany." (*Id.* at ¶ 32). In April 1995, New York State, and eventually, the City of Albany, "received a six million dollar grant from [Housing and Urban Development] to evaluate and reduce lead-based paint hazards in private housing rented or owned by low-income families" in these neighborhoods. (*Id.* at ¶ 34). According to plaintiff, 355

residential dwellings were abated under this grant. (Id. at ¶ 36). In January 1998, defendants received funding from another grant to New York State to develop a program funding the inspection and remediation of lead-based paint hazards in moderate to low income housing in areas of Albany referred to as Arbor Hill, West Hill, and South End. (Memorandum of Law in Support of Defendants' Motion to Dismiss, Docket No. 19, p. 2) ("Def. Memo. at ___").

The following year, in late May 1999, defendant City of Albany applied for its own Housing and Urban Development grant, which it was awarded in the form of a two-year, $4,000,000 grant, the contract period to begin on January 1, 2000. (Id.). According to plaintiff, 292 residential dwellings were abated under this grant. (Complaint, Docket No. 1, ¶ 39). Thereafter, a second two-year grant was obtained by defendants, this time in the amount of $3,000,000, the contract period to begin on December 12, 2001. (Def. Memo. at 2). Under all of the above grants, defendants were responsible for overseeing the inspection, assessment, and abatement of the lead hazards in selected housing, as well as the administration of post-abatement procedures, including the collection and testing of soil samples. Apparently, most of the work was performed by private contractors who signed contracts with the persons whose homes were selected for abatement.

Defendants contend that as a condition of being awarded these grants, the City of Albany "has been, and continues to be, required to use certified contractors to perform all of the work under the [lead abatement] [p]rogram." (Id.). Because New York State has no certification program, federal regulations require defendants to use only EPA-certified individuals to conduct all activities related to the abatement of lead hazards. (Complaint, Docket No. 1, ¶ 21). Defendants claim, however, that they "obtained a federal waiver allowing [them] to use an out-of-state training program for certification of its contractors, namely the training program established by the State of Connecticut." (Def. memo at 3). After March 1, 2000, federal regulations mandated that individuals and firms engaged in lead-based paint activities, including activities described in 40 C.F.R. §§ 745.225—745.227, 745.233, dealing with inspections, risk assessments, abatements, and post-abatement clearance, must receive certification by the EPA.

Plaintiff contends that defendants have shown "blatant disregard" for these regulations by using uncertified inspectors or risk assessors to conduct inspections and prepare inspection reports; uncertified risk assessors to conduct and make a report of risk assessments; uncertified individuals to conduct lead-based paint abatements; and uncertified inspectors or risk assessors to perform post-abatement clearance procedures. Defendants have also allegedly failed to have properly certified supervisors on site during all work site preparation and post-abatement procedures; to have properly certified individuals prepare a written occupant protection plan; to use certified inspectors or risk assessors to collect and analyze paint chips, dust, or soil samples, and to perform all or most of the above in compliance with the substantive requirements governing lead-based paint activities. (Complaint, Docket No. 1, ¶¶ 49–89). Defendants dispute all of these allegations, contending that at all times they used properly certified individuals to conduct lead-based paint activities, and that the work performed was satisfactory and compliant with federal regulations.

The Complaint does not mention the names of any of plaintiff's members, let alone allege that any specific member had lead-based paint work performed at his or her home. However, it is generally alleged, for example, that "[p]laintiff is a citizens group whose members reside in the Lead Paint Abatement Program's target areas and are harmed by [d]efendants' failure to comply with federal law and regulations designed to protect public health from the serious risks associated with lead-based paint activities," and that "[i]ndividual members of [plaintiff] live and recreate in residential dwellings in Arbor Hill, South End, and West Hill that have been abated, or, on information and belief, will be abated under, or whose owners are eligible and wish to apply to the Lead Paint Abatement Program." (Complaint, Docket No. 1, ¶¶ 5, 11).

Attached to the Complaint is a copy of a "Notice of Intent to Sue under Section 20(a)(1)(B) of the Toxic Substances Control Act, 15 U.S.C. § 2619(a)(1)(B)," addressed to individual defendants Jennings, Leveille, and Montana. (*Id.*, Exhibit A). Among other things, contained in the notice are various specific addresses at which plaintiff contends the above violations occurred. No names of plaintiff's members are mentioned as being owners of or recreators in or around said properties. Again, only general allegations are made. The only real addition this notice makes seems to be specific addresses.

### III. *DISCUSSION*

In moving to dismiss the Complaint, defendants contend that plaintiff has not demonstrated standing on the pleadings, that part of the relief sought by plaintiff is beyond the scope allowed by the TSCA, and that plaintiff, as an unincorporated association, has no capacity under New York State law to bring this suit.

### A. *STANDING*

Article III of the Constitution limits federal courts' adjudicatory powers to only "Cases" and "Controversies." U.S. Const. Art. III, § 2; *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 381 (2d Cir.2000). A central component of this limitation is the maxim that plaintiffs must have standing to bring suit. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Because plaintiff is not alleging its relationship with its members has been injured, but rather, very generally, that its members are citizens living in an area in which lead abatement work was, or might be, performed and have suffered or will suffer injury, the standing analysis proceeds under the three-pronged test laid out by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See Sun City Taxpayers' Assn. v. Citizens Utilities Co.*, 45 F.3d 58, 61 (2d Cir.1995); *Greater New York Auto. Dealers Assn. v. Environmental Systems Testing, Inc.*, 211 F.R.D. 71, 79 (E.D.N.Y. 2002). Under the test, associational standing is established if: (1) the association's members would otherwise have standing to sue in their own, individual right; (2) the interest the association seeks to protect through the lawsuit is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires participation in the lawsuit by the individual members of the association. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434; *see also Rent Stabilization Assn. v. Dinkins*, 5 F.3d 591, 596 (2d Cir.1993); *Aiken v. Nixon*, 236 F.Supp.2d 211, 224 (N.D.N.Y.2002). Only the first and third prongs will be dis-

cussed.[1]

 Plaintiff, as "[t]he party invoking federal jurisdiction[,] bears the burden of establishing standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). However, any analysis of Article III standing is to be conducted keeping in mind the "manner and degree of evidence required at the successive stages of the litigation." *Id.* Thus, where, as here, standing is challenged on the basis of the pleadings, a court is required " 'to accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir.1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

### 1. *Prong One: Individual Member Standing*

 Plaintiff cannot satisfy the first prong of the *Hunt* test. In order to demonstrate individual Article III standing to sue, three requirements must be fulfilled: (1) the individual plaintiff must have suffered an "injury in fact" that is concrete and particularized, and actual or imminent, as opposed to conjectural or hypothetical;

(2) a causal connection must exist between the individual plaintiff's injury and the complained of conduct that makes the injury fairly traceable to the complained of conduct, as opposed to being the result of independent acts by a third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the individual plaintiff's injury will be redressed by a favorable decision. *See Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181–83, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *see also Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. "These requirements together constitute the irreducible constitutional minimum of standing, which is an essential and unchanging part of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches." *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (internal quotations and citations omitted). As plaintiff cannot on the present pleadings establish that its individual members suffered an injury in fact, the remaining two requirements for individual standing will not be discussed.[2]

---

1. Defendants make a half-hearted effort to argue plaintiff's non-compliance with the second *Hunt* prong—that the interest plaintiff seeks to protect through the lawsuit is germane to its purpose—by claiming that "the limited allegations surrounding the purposes and membership of [plaintiff] are, at best, sketchy." (Def. memo at 12). For the purposes of this stage of the litigation, however, it is here found that the "sketchy" allegation that the organization has existed for over twenty years and was formed to protect and improve the quality of life and public health of the Arbor Hill community suffices to demonstrate the requisite link between the issues in the lawsuit and plaintiff's purpose. (*See* Complaint, Docket No. 1, ¶ 10). It is also here found that there are no "prudential" concerns present so as to counsel against

adjudicating the parties' disputes in a judicial forum. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir.2003) ("Standing generally has two aspects: constitutional standing, [i.e., the three *Hunt* prongs], and prudential considerations of standing, which involve judicially self-imposed limits on the exercise of federal jurisdiction. Prudential considerations include the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked") (internal quotations and citation omitted).

2. Because injury in fact has not been demonstrated, the remaining two requirements for

Without question, plaintiff's members have an *interest* in the subject matter and issues of this litigation. However, for standing purposes, more is needed. "The Supreme Court in [*Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)] explained that 'an organization whose members are *injured* may represent those members,' but that an organization whose members alleged an *interest but no injury* was not adversely affected and thus could not have standing." *Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (emphasis added). "The Supreme Court has defined 'particularized' to mean 'that the injury must affect the plaintiff in a personal and individual way'." *Knaust v. City of Kingston*, 193 F.Supp.2d 536, 540 (N.D.N.Y. 2002) (quoting *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130). Thus, an individual plaintiff must have suffered a concrete and particularized injury so as to give him or her a personal stake in the outcome of the litigation, not just a mere interest. *See Warth*, 422 U.S. at 498–99, 95 S.Ct. 2197; *see also U.S. E.P.A. ex rel. McKeown v. Port Authority of New York and New Jersey*, 162 F.Supp.2d 173, 184 (S.D.N.Y. 2001) (no concrete or particularized injury where it is alleged only that member "has sustained damages as a result of the operation of toll booths" and that "[d]efendant[s'] operation of toll booths damage the business, property and health of the [p]laintiff" in violation of antitrust laws).

In the complaint, plaintiff most certainly alleges possible concrete and particularized injuries. Indeed, plaintiff takes great pains to allege the various harms associated with lead and lead-based paint, and the federal law and regulations presumably enacted as a response to these dangers. However, none of these injuries are ever, at any point, alleged to have been incurred by a specific member of plaintiff. Nothing short of generalized injury or potential injury to its members as a result of defendants' allegedly improper abatement procedures and workers is alleged in the complaint. Neither in the entire complaint in general, nor perhaps more importantly, in the paragraphs containing the substantive allegations of non-compliance with federal law and regulations, is the name of any of plaintiff's members mentioned. Nowhere in the complaint is there even an allegation that any specific member of plaintiff had lead-based paint abatement work performed. In short, the individual standing analysis, with respect to the members of plaintiff, cannot be performed. Thus, while plaintiff has sufficiently plead that concrete and particularized injuries are associated with lead-based paint, it has not sufficiently plead that such injuries have been incurred by any of its specific members so as to properly demonstrate that individual members have suffered an injury in fact.

Plaintiff makes much of the fact that attached to the complaint is its "Notice of Intent to Sue . . ." to various defendants, which includes a list of addresses where various violations allegedly occurred, (Complaint, Docket No. 1, Exhibit A), and implies that more specific information will emerge through discovery. However, similar to the Complaint, omitted from the list are names of individuals who are members of plaintiff, and just because discovery may bear relevant fruit does not relieve plaintiff of its burden of demonstrating injury in fact on the pleadings.

individual standing cannot be evaluated, as both depend on knowledge of the specific alleged injury or injuries. However, if plaintiff can so establish an injury in fact to its

individual members, it is here opined that satisfaction of the remaining two prongs is likely.

*See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 486, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy. That concrete adverseness which sharpens the presentation of issues is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself") (internal quotations and citation omitted); *see also Matter of Appointment of Independent Counsel,* 766 F.2d 70, 74 (2d Cir. 1985) ("Instead, th[e] phrase [concrete adverseness] simply reflects the helpful consequences that follow after a plaintiff has met Article III's rigorous actual case-or-controversy requirements").

It is conceded that courts, when faced with the standing issue under the citizen suit provisions of other environmental laws, have allowed more general allegations of injury to suffice at the pleading stage, *see, e.g., Laidlaw,* 528 U.S. at 183, 120 S.Ct. 693 ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity") (quoting *Morton,* 405 U.S. at 735, 92 S.Ct. 1361); *Friends of the Earth v. Consol. Rail Corp.,* 768 F.2d 57, 61 (2d Cir.1985) (stating that standing was established from allegations that one person claimed he passed through Hudson River frequently and found the pollution therein offensive, and another who averred his family regularly participated in fishing, picnicking, and swimming there); *Sierra Club v. SCM Corp.,* 747 F.2d 99, 107 (2d Cir.1984) (stating that an organization could demonstrate standing if it could prove that the organization or one of its members used the allegedly polluted waterway at issue or would be affected by

said alleged pollution), and that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

These principles, however, are of no avail to plaintiff. A key ingredient to invocation of those principles that is wholly absent in the instant matter is the presence of allegations of injury to specific members of the organization. More relevant from those cases is the mandate that organizational plaintiffs need not provide specific allegations of the alleged wrong in the pleadings—in this case, the site-specific facts going to the specific violations, such as one alleging that John Doe was uncertified and performed work in an improper way at 100 Main Street—so long as plaintiff at least makes some minimal allegations that specific members indeed had the work in question performed on their homes, and have suffered some concrete and particularized injury as a result thereof. Thus, while general factual allegations of injury will suffice, they must be general factual allegations of injury to someone, not just in general, and not just in the purely hypothetical or speculative sense. As noted, not one of plaintiff's member's names is ever explicitly mentioned in the complaint as having work done on his or her home, or as being specifically injured. This is insufficient, even at the liberal pleading stage in which the litigation currently finds its home. Therefore, as standing has not been established on the pleadings, no subject matter jurisdiction exists at this time.

### 2. *Prong Three: Individual Member Participation*

As noted, the third *Hunt* prong requires plaintiff to demonstrate that the lawsuit will not require the participation of its individual members. While this prong

is more likely unfulfilled where the association is seeking monetary damages on behalf of its members that are uncommon to or different in degree for all members, *Warth*, 422 U.S. at 515–16, 95 S.Ct. 2197, it is more readily satisfied when the association is seeking. injunctive or declaratory relief. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1348–49 (2d Cir. 1989).

While in the instant case individual members of plaintiff may have to come forward with evidence that lead abatement work was performed on their homes or in places where they recreate, no testimony is needed from said members to establish the alleged violations in performing such work. No member of plaintiff will be able, for example, to testify that any worker was uncertified, nor will any member be able to testify to non-compliance with the technical mandates of the federal regulations regarding the manner and form in which the work was carried out. The members can only testify that the work was done as a background for the argument that the work was done improperly or using improper or uncertified workers, which will, as plaintiff claims, be proven largely through the testimony and records of those who were employed by the defendants to perform the work.

In fact, if defendants' argument—that the presence of individual member testimony automatically voids associational standing—were adopted, almost no association could ever bring suit on its members' behalf, short of simple, straightforward facial challenges to legislation. It would seem that in environmental suits seeking to halt conduct that allegedly violates a vast federal regulatory scheme, of which

an ordinary citizen has little substantive knowledge, any testimony by individual members would be peripheral to proving the existence of actual violations, and alone would provide no basis for finding in plaintiff's favor. Thus, the actual claims made by plaintiff will not require participation of individual members at a level and to a degree that would defeat associational standing.

Defendants' more plausible argument under this third *Hunt* prong is that individual member participation is necessary to obtain the relief sought by plaintiff. *See National Assn. of College Bookstores, Inc. v. Cambridge Univ. Press*, 990 F.Supp. 245, 248 (S.D.N.Y.1997) ("The third prong of the *Hunt* test can be broken down into two parts—the 'claim asserted' and the 'relief requested' elements"); *see also Hunt*, 432 U.S. at 343, 97 S.Ct. 2434 (third prong satisfied only where "neither the claim asserted *nor the relief requested* requires the participation of individual members in the lawsuit") (emphasis added). Plaintiff principally seeks to "[p]ermanently enjoin [d]efendants from directing, administering, and operating the City of Albany Lead Paint Abatement Program, except in accordance with TSCA and other applicable regulatory requirements." (Complaint, Docket No. 1, Prayer for Relief, p. 19, ¶ 1). Indeed, as further evidence that plaintiff's primary concern is with the alleged continued statutory and regulatory violations, the last paragraph under each of the five claims for relief alleges that "[u]nless restrained by an [O]rder of this Court, [d]efendants will continue to be in violation of [the Toxic Substances Control Act]." (Complaint, Docket No. 1, ¶¶ 56, 64, 78, 84, 89). This is purely injunctive relief, and no more requires the participation of individual members than does proving the substantive violations.

Had plaintiff stopped here, the inquiry would be at an end. Plaintiff did not so stop. Specifically, plaintiff also seeks, *inter alia*, to have defendants ordered to take other appropriate actions to remedy, mitigate, or offset the harm to public health caused by the alleged violations, including, but not limited to: (1) ensuring that all residential dwellings that were improperly abated are safe for human habitation; and (2) conducting medical monitoring of those residents who may be exposed to the grave health risks of lead poisoning. (Complaint, Docket No. 1, Prayer for Relief, p. 20, ¶ 3). This relief is facially at odds with what is presumed to be the essential purpose of the lawsuit—to halt allegedly improper conduct. That purpose serves plaintiff's members as a whole, and goes to the heart of a remedy like injunctive relief. This relief, on the other hand, is inconsistent with the notion that the benefit of the litigation inures to the group as a whole, in that it focuses more on individual injuries that may have been suffered by individual members.

At trial, each and every person whose home was allegedly abated improperly would not only have to testify as to the background material that their homes had work performed, which is permissible but certainly not necessary, *see supra*, such persons would also have to testify to their current medical condition. According to plaintiff, the number of homes abated under the program number in the hundreds. If it is assumed that more than one individual lives at most homes, that number could easily eclipse one thousand. In addition, the scope of medical monitoring will not be uniform. Each person may have been subject to different levels of expo-sure, and may require different types of monitoring, varying in degree and quantity. It is this type of heterogenous relief, requiring extensive individual participation, that is sought to be curtailed by the third prong of the *Hunt* test.

### B. SCOPE OF RELIEF

 Even if plaintiff's presumed contention that medical monitoring will be uniform, or that it will merely be a consequence of ordering the relief and will not require individual proof at trial, it is still relief that is beyond the scope afforded by the TSCA. The same is true of other relief sought by plaintiff, namely "[o]rder[ing] [d]efendants to remedy their violations of TSCA," and "[o]rdering [d]efendants to ... ensur[e] that all residential dwellings that were improperly abated are safe for human habitation." (Complaint, Docket No. 1, Prayer for Relief, p. 20, ¶¶ 2, 3(a)).[3] All parties agree that the TSCA only authorizes citizen suits "to restrain" violations of its substantive provisions. 15 U.S.C. § 2619(a)(1)(B); (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, Docket No. 22, p. 15); (Def. Memo. at 17); (Reply Memorandum of Law in Support of Defendants' Motion to Dismiss, Docket No. 24, p. 9).

The injunctive relief sought by plaintiff—to permanently enjoin defendants from violating the statutory/regulatory provisions—is certainly that which is contemplated by the TSCA. To "restrain" means "[t]o control [or] check" or "[t]o limit or restrict." The American Heritage Dictionary (2d ed.1985). Because the word is in the present tense, and you cannot control, check, limit, or restrict anything that has already stopped, it is implied in the statutory language that a

---

**3.** Plaintiff also seeks attorneys' fees, expert witness fees, and costs, (Complaint, Docket No. 1, Prayer for Relief, p. 20, ¶ 4), all of which are properly recoverable under the TSCA. *See* 15 U.S.C. § 2619(c)(2).

citizen suit may seek "to restrain" something that is ongoing or continuous, and that may continue in the future. Thus, the injunctive relief, which seeks to restrain the alleged ongoing violations of the TSCA and any future violations of the TSCA, is permissible.[4]

Isolating the phrase "to restrain" from its statutory text may compel the conclusion that ordering defendants to remediate any allegedly improperly abated homes and to medically monitor those whose homes were abated is also indicative of a future restraint. However, the statute permits only restraint of violations *of the TSCA*, not restraints on the *consequences* of violations of the TSCA. To re-abate the homes and to medically monitor residents restrains people from being ill or from being exposed to lead-based paint. These are not violations of the TSCA. The TSCA is in place to serve as a procedural guide to abating homes with lead-based paint hazards.

Indeed, the relief sought does not really "restrain" anything. It is more reasonable to read it as seeking to "remedy" the alleged violations of the statute, a word plaintiff itself uses in the Complaint when describing the relief sought. The verb "remedy" means "[t]o set right or rectify (an error)." The American Heritage Dictionary (2d ed.1985). It does not mean to stop or prevent something that is ongoing like the phrase "to restrain" does. Had the drafters of the TSCA meant to permit plaintiff to seek to not only stop statutory

violations, but also have defendants take such drastic steps to right the wrongs to individual members of plaintiff, it is hoped they would have made that clear. Accordingly, that part of the relief sought by plaintiff—to order defendants to remedy the alleged violations, to order defendants to ensure that all improperly abated dwellings are made safe for habitation, and to order defendants to medically monitor all persons residing or recreating in such dwellings—is inappropriate and that part of the Complaint must be dismissed with prejudice.

It is important to note that this is not to be interpreted to mean that individual members of plaintiff, if the statutory violations are eventually proven, will not have claims that may involve remedying the improper abatements or being medically monitored. Those individual plaintiffs may well have those rights vindicated under other laws, federal and/or state. It is only concluded here that plaintiff, as an unincorporated association bringing suit on behalf of its members under the TSCA to restrain ongoing violations, cannot seek such relief.

### C. *CAPACITY TO SUE*[5]

■ In addition to the above-noted problems, the Complaint is also wrought with a capacity-related defect. Where plaintiff, like the one here, is not an individual or corporation, Fed.R.Civ.P. 17(b) provides that:

---

**4.** Defendants contend that, because all alleged violations of the TSCA occurred in the past, even the injunctive relief is unavailable, an argument they also make to demonstrate the issues in this case are moot. However, whether the violations are ongoing is the heart of the dispute between the parties, and deciding the factually intense question at this stage of the litigation is impermissible.

**5.** "[T]he concept of capacity is often confused with the concept of standing, but the two legal doctrines are not interchangeable. 'Standing' is an element of the larger question of 'justiciability' ... 'Capacity,' in contrast, concerns a litigant's power to appear and bring its grievance before the court." *Community Bd. 7 of Borough of Manhattan v. Schaffer,* 84 N.Y.2d 148, 154–55, 615 N.Y.S.2d 644, 646–47, 639 N.E.2d 1 (1994).

capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, . . .

It is not in dispute that plaintiff is suing "for the purpose of enforcing for or against it a substantive right existing under the . . . laws of the United States." What is in dispute is whether that fact excuses plaintiff from heeding the provisions of New York State law dealing with the mechanics of a lawsuit involving an unincorporated association. In other words, it must be determined whether subsection (1) is an exception, as plaintiff terms it, to the rule immediately preceding it—that capacity to sue is to be determined by the law of the state in which the district court sits—or whether it applies only when plaintiff is seeking vindication of rights created by federal law *and* the law of the state in which the district court sits does not grant plaintiff capacity to sue.

It is here found that the latter interpretation controls. One need look no further than the clear language of Fed.R.Civ.P. 17(b). Immediately following "partnership or other unincorporated association" is a comma and then the phrase "which has no such capacity by the law of such state." Common rules of grammar and syntax tell us that the use of the comma and then the immediate use of the word "which" evinces an intent to have the phrase refer to the immediately preceding noun—in this case, the noun "unincorporated association." There are no words indicative of an alternative or of an intent to make the phrase optional.

Further, if plaintiff's interpretation were correct, the phrase would be mere surplusage. It would not be needed. The language would simply read "except that a partnership or other unincorporated association may sue or be sued in its common name for the purpose of enforcing for or against it a substantive a substantive right existing under the Constitution or laws of the United States." This would make the entire rule potentially inapplicable to every lawsuit which does not have its basis in diversity of citizenship. All lawsuits in federal court under the auspices of federal question jurisdiction are filed to enforce federally created rights. Essentially, such an interpretation would make state rules governing capacity to sue applicable only to suits grounded in diversity of citizenship. Had the drafters of the rule intended a conclusion so at odds with the text and notions of common sense, they would have surely drafted it differently.

It is more likely therefore that the relevant language is present to provide for those situations where state law provides no capacity to sue or be sued. Another look at the statutory language used supports this conclusion. The operative phrase—"which has no such capacity by the law of such state"—tellingly uses the words "by the law of such state." The word "such" implies that the law being referred to has already been mentioned in the text. Otherwise, the applicable state law would be explicitly mentioned in the operative phrase. The lead-in phrase prior to the subdivision (1) clause provides the answer as to which state law is being referenced by the words "by the law of such state." Specifically, it is the "law of the state in which the district court is held." This lawsuit is in the Northern District of New York, so the applicable state law is New York. Therefore, only if New York State law does not grant plain-

tiff capacity to sue, and plaintiff is seeking redress for the alleged violation of a federal right, does Fed.R.Civ.P. 17(b)(1) allow suit to proceed in plaintiff's name.

■■■■■ Capacity to sue often "depends purely upon a litigant's status." *Schaffer,* 84 N.Y.2d at 155, 615 N.Y.S.2d 644, 639 N.E.2d 1. Here, plaintiff admittedly is an "unincorporated association." (*See* Complaint, Docket No. 1, ¶ 10: "Plaintiff . . . is an unincorporated, not-for-profit association of residents who live in the Arbor Hill neighborhood, adjacent to downtown Albany"). Pursuant to N.Y. General Associations Law § 12, an unincorporated association is afforded the capacity to sue through its presidents or treasurer. *Schaffer,* 84 N.Y.2d at 155, 615 N.Y.S.2d 644, 639 N.E.2d 1; *Tibaldi v. Brezenoff,* 65 N.Y.2d 710, 711, 492 N.Y.S.2d 4, 481 N.E.2d 544 (1985), or, because the statutory provision is generally viewed as "a pleading and procedural aid," *Sackman v. Maritas,* 156 Misc.2d 939, 595 N.Y.S.2d 655, 656 (N.Y.Sup.Ct.1992), and not as "denying a right of action to an association lacking officers bearing such titles," *Locke Associates, Inc. v. Foundation for the Support of the United Nations,* 173 Misc.2d 502, 504, 661 N.Y.S.2d 691 (N.Y.C.Civ.Ct.1997), suit can be brought in the name of "an officer who is the functional equivalent" to a president or treasurer. *Id.*

The instant action was filed in the name of the unincorporated association alone, and not through its president or treasurer, or officer who executes equivalent functions. Nonetheless, this defect is not fatal and can be corrected. *See, e.g., Concerned Citizens of Albany–Shaker Road v. State,* 140 A.D.2d 842, 528 N.Y.S.2d 230, 232 (N.Y.App.Div.1988). Plaintiff will be permitted to file an Amended Complaint, this time in the name of the appropriate officer. If plaintiff "has a president or treasurer, title alone is statutorily determinative. The court need not inquire into their specific functions, or whether they are appropriate representative parties. [If plaintiff has] no president or treasurer, the court must examine the organization's structure to determine if the person who commenced the action is an elected or de facto officer performing equivalent functions and responsibilities" as a president or treasurer. *Locke Associates,* 173 Misc.2d at 504, 661 N.Y.S.2d 691. Therefore, only in the event that plaintiff has no president or treasurer do the specific functions of the person in whose name the suit is brought require delineation in the pleadings.[6]

### D. *CONDITIONAL DISMISSAL*

Defendants' motion to dismiss the complaint will be granted in part and conditionally granted in part. Plaintiff may file an Amended Complaint to correct the jurisdictional and capacity-related defects in the pleadings. Specifically, plaintiff must include in the Amended Complaint, sufficient allegations that particular members of it had lead-based paint abatement work performed and are suffering a concrete and particular, *and* actual or imminent, injury therefrom. Plaintiff must also file the Amended Complaint in the name of its President or Treasurer, or an individual performing equivalent functions in accordance with the instructions above. In the event plaintiff cannot correct the jurisdictional and capacity-related defects by complying with the foregoing, the Complaint will be dismissed without prejudice.

---

**6.** Any argument raised by defendants that these rules can be manipulated by plaintiff is ill-conceived, as absolutely no prejudice inures to them by virtue of the name of the person bringing the suit. The instructions are given merely to correct a procedural—not substantive—defect in the pleading.

That part of the Complaint relating to relief that was found to be beyond the scope of the TSCA, however, is dismissed with prejudice and must be omitted from the Amended·Complaint.

## IV. *CONCLUSION*

On the current pleadings, plaintiff has not established standing and does not have the capacity under New York State law to maintain this suit. Plaintiff may file and serve an Amended Complaint to comply with the mandates above.

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED with respect to certain relief sought in the Complaint, to wit, paragraphs 2 and 3 under "Prayer for Relief" on page 20 of the Complaint, and such paragraphs are dismissed with prejudice;

2. Plaintiff is permitted to file and serve an Amended Complaint in accordance with the directives of this decision on or before April 18, 2003;

3. Upon a failure to file and serve a timely Amended Complaint—the Complaint is DISMISSED, without prejudice, and the Clerk is directed to enter judgment accordingly; and

4. Upon timely filing and service of an Amended Complaint, the defendants shall file and serve an answer or motion on or before May 16, 2003.

IT IS SO ORDERED.