Aaron MAIR, as President of Arbor Hill Concerned Citizens Neighborhood Association, Plaintiff,

v.

CITY OF ALBANY, NEW YORK; Gerald Jennings, in his official capacity as Mayor of Albany; Department of Development and Planning; George Leveille, in his official capacity as Commissioner of the Department of Development and Planning; Albany Community Development Agency; and Joseph Montana, in his official capacity as Director of the Albany Community Development Agency, Defendants.

No. 02–CV–1016.

United States District Court, N.D. New York.

Jan. 22, 2004.

Natural Resources Defense Council, Inc. (Michelle B. Alvarez, Esq., Nancy S. Marks, Esq., Lawrence M. Levine, Esq., of Counsel), New York City, Marc S. Gerstman, Esq., Albany, NY, for Plaintiff.

Nixon Peabody LLP (Sheri L. Moreno, Esq., Frank L. Amoroso, Esq., Robert S. McEwan, Esq., of Counsel), Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Aaron Mair ("plaintiff"), as President of the Arbor Hill Concerned Citizens Neighborhood Association ("Arbor Hill"), filed this second amended complaint against defendants, alleging various causes of action under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, under 42 U.S.C. § 1983, to enforce alleged federal rights under the Residential Lead–Based Paint Hazard Reduction Act ("RLPHRA"), 42 U.S.C. § 4851 and

the Community Development Act ("CDA"), 42 U.S.C. § 5301 *et. seq.*, and under state common law, all arising out of lead-based paint abatement activities conducted by defendants on homes in certain neighborhoods of the City of Albany.

Defendants filed a motion to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12. · Plaintiff opposed. Oral argument was heard on September 26, 2003, in Albany, New York. Decision was reserved.

## II. BACKGROUND

### A. The Original Complaint and Memorandum–Decision and Order

On August 6, 2002, Arbor Hill filed a complaint against defendants, seeking relief for the alleged failure to use properly certified workers in the inspection, risk assessment, abatement, and post-abatement activities and analysis of homes identified as posing lead-based paint hazards, and alleging that the work performed was in violation of the TSCA and governing federal regulations. (Docket No. 1.)[1] In support of the allegations, however, Arbor Hill identified none of its members by name and/or address that had abatement work performed on his or her home.

For relief, Arbor Hill principally sought to permanently enjoin defendants from conducting lead-based paint activities except in accordance with the TSCA and federal regulations. Arbor Hill also sought, however, to have defendants· ordered to take other appropriate actions to remedy, mitigate, or offset the harm to

the . public caused by the alleged violations, including but not· limited to: (1) ensuring that all residential dwellings that were improperly abated are safe for human habitation; and (2) conducting medical monitoring of those residents who may be exposed to the grave. health risks of lead poisoning.

·. By Memorandum–Decision and Order filed March 18, 2003, certain relief, including these two measures of . relief, were stricken from the complaint as being beyond the scope of the TSCA, which only authorizes citizen suits "to restrain" ongoing and future violations of its substantive provisions. *See Arbor Hill,* 250 F.Supp.2d at 59–60. The remainder of the complaint was dismissed without prejudice for lack of standing because of Arbor Hill's failure to particularly identify any of its.members as among those who allegedly had abatement work performed.[2] *Id. .* at 54–59. Specifically, while it was recognized that "general factual allegations of injury will suffice" to survive a motion to dismiss in a case brought under the citizen suit provision of an environmental statute, such allegations must nonetheless allege "injury to someone, not just in general, and not just in the purely hypothetical or speculative sense." *Id.* at 57.

### B. The Second Amended Complaint

After filing an amended complaint, plaintiff was granted permission to file a second amended complaint, which he did on May 27, 2003. In the second amended complaint, plaintiff attempts to cure the standing defects that plagued the original

---

1. The specific factual allegations underlying this claim were outlined in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany,* 250 F.Supp.2d 48, 52–54 (N.D.N.Y. 2003), and will not be repeated here.

2. It was also dismissed because Arbor Hill lacked the capacity to maintain the suit in its

name. *Arbor Hill,* 250 F.Supp2d at 61–62. Arbor Hill was directed to ·cure this defect in · the event an amended complaint was filed. *Id.* at 62. By bringing suit in the name of plaintiff, Arbor Hill's president, the capacity-related defect has been cured.

complaint and to modify the relief requested that was stricken, and also adds three new causes of action.

### 1. *Member-specific allegations*

In the second amended complaint, which is a stunning 183 paragraphs, not including 10 paragraphs in the "Prayer for Relief" section, plaintiff alleges that six named members of Arbor Hill had lead-based paint abatement work performed on their homes. Generally, it is alleged that, after the work was performed, each member discovered, on his or her own or through an independent inspector, that lead hazards still remained, and that each feared allowing family members to play in or around the allegedly hazardous areas.

### 2. *Modified relief requested*

In the second amended complaint, plaintiff also modifies the portion of the requested relief that had been stricken from the original complaint. Specifically, rather than seeking to have defendants remedy allegedly deficient abatement work and medically monitor affected members of Arbor Hill, plaintiff now seeks an order to "[r]estrain [d]efendants' ongoing violations of TSCA at homes where lead-based paint activities have begun but have not been completed pursuant to the requirements of the TSCA ... by ordering [d]efendants to take all actions necessary to complete those lead-based paint activities in the manner required by TSCA and EPA regulations." (Docket No. 33, Prayer For Relief, ¶ 2.)

### 3. *New causes of action*

In the Memorandum–Decision and Order dismissing the original complaint, the parties were warned that the disposition therein was "not to be interpreted to mean that individual members of plaintiff, if the statutory violations [of the TSCA] were eventually proven, will not have claims that may involve remedying the improper abatements or being medically monitored. Those individual plaintiffs may well have those rights vindicated under other laws, federal and/or state." *Arbor Hill*, 250 F.Supp.2d at 60. Plaintiff has apparently read this language as a prompt to assert three new causes of action in the second amended complaint.

First, in the *fifth* cause of action, plaintiff claims defendant Albany Community Development Agency, which allegedly performed abatement activities, was not an EPA-certified firm, which is a further violation of the TSCA.

Second, in the *sixth* cause of action, plaintiff claims that, pursuant to 42 U.S.C. § 1983, defendants had a policy and custom of depriving Arbor Hill members of the federal rights guaranteed to them under the RLPHRA and CDA. It was under those two statutes that defendants received funding for the abatement activities, and under which plaintiff claims the certification and substantive requirements of the TSCA are incorporated.

Third, in the *seventh* cause of action, plaintiff claims that defendants breached contractual duties to Arbor Hill members, as third-party beneficiaries of the RLPHRA and CDA grants used to fund the abatements, by failing to comply with the certification and substantive mandates of TSCA and implementing federal regulations.

## III. DISCUSSION

### A. *Rule 12(b) Standard*

Defendants have moved to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6). In deciding a Rule 12(b) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences

in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995). However, condusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *See, e.g., Clapp v. Greene*, 743 F.Supp. 273, 276 (S.D.N.Y.1990); *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir.1988).

### B. Standing

In the Memorandum–Decision and Order dismissing the original complaint, plaintiff was instructed that an amended complaint "must include ... sufficient allegations that particular members of [Arbor Hill] had lead-based paint abatement work performed and are suffering concrete and particular, and actual or imminent, injury therefrom." *Arbor Hill*, 250 F.Supp.2d at 62. As noted, this holding emanated primarily from the failure to allege, in the original complaint, that particular members of Arbor Hill had abatement work performed on their homes. Under the liberal pleading stage in which the litigation finds its home, it appears as though plaintiff has now cured this standing defect.

In the second amended complaint, plaintiff details the abatement work performed for six Arbor Hill members. Accepting as true the allegations made, abatement work was performed at the homes of all of the named members, and inspection subsequent to the work found that all hazards had not been abated. Thus, plaintiff has complied with the first part of the instruction in the Memorandum–Decision and Order, to wit, identify specific members of Arbor Hill who have had abatement work performed.

Defendants argue, however, that "[t]he injuries alleged in the [s]econd [a]mended [c]omplaint are, at best, speculative or hypothetical and do not confer standing to plaintiff." (Docket No. 40, p. 4.) Defendants then proceed to dissect the allegations made with respect to each of the six members of Arbor Hill, concluding ultimately that plaintiff has not satisfied the standing requirements because: (1) the regulations defining and governing lead hazards were not plead to have been followed by the independent inspector; and/or (2) the allegations of generalized health or safety concerns were speculative.

■ It is worth noting initially that plaintiff need only satisfy the individual standing requirement—of the larger associational standing requirements—with respect to one of its members. *See Sierra Club v. SCM Corp.*, 747 F.2d 99, 107 (2d Cir.1984). Taking as true the allegations with respect to the first named member in the second amended complaint—the Bennett family—it is clear that plaintiff has satisfied the standing requirements. Specifically, it must be accepted that: (1) abatement work was performed on the Bennett home in August 2001; (2) following the abatement work, in July 2002, one of the Bennett children saw his blood lead level increase after he played in and around the family yard; (3) a member of the Albany County Department of Health, who had found hazards prior to the abatement work, found them again in August 2002 after the work had been completed; (4) an EPA-certified inspector, presumably hired by Arbor Hill, found high levels of lead in the soil in the family's backyard, in October 2002 and again in April 2003; and

(5) another of the Bennett children saw her blood lead level increase in March 2003.

Such allegations are specific enough to satisfy the directive in the earlier Memorandum–Decision and Order. Though defendants appear to argue that any concerns alleged by the Arbor Hill members are vague and speculative, plaintiff has plead the various dangers associated with exposure to lead, which allegations also must be accepted as true at this stage of the litigation. Indeed, plaintiff should not have to wait until an Arbor Hill member dies, or becomes gravely ill, before commencing suit. A hired inspector—which, by the way, is alleged to have been employed in all or nearly all of the cases of the named members—certified by the EPA who has allegedly found hazards to exist, combined with the dangers associated with exposure to lead, is certainly an adequate basis to allege a concrete and imminent danger.

Defendants' other argument—that the independent inspection is not a sufficient basis on which to base health concerns, because it was not alleged to have been conducted in strict accordance with the guidelines governing and defining lead hazards—is also rejected. At the pleading stage, plaintiff does not have to actually prove that substantive violations of the TSCA occurred, much less the injuries flowing therefrom. Rather, at this stage the sole concern is whether the allegations, if true, could form the basis of a valid claim. As noted, the allegations here could form the basis of a valid claim. Defendants may renew their arguments at the summary judgment stage and, if necessary, at trial. Plaintiff has cured the standing defects in the original complaint.

### C. Scope of Relief

■ In the original complaint, Arbor Hill sought, as relief for the alleged TSCA violations, an order directing defendants to remedy the allegedly improperly abated homes, and to medically monitor those affected. Because the TSCA authorizes citizen suits only to restrain ongoing and future violations of its substantive provisions, this relief was stricken from the complaint. In the second amended complaint, plaintiff asks the court to issue an order to "[r]estrain [d]efendants' ongoing violations of TSCA at homes where lead-based paint activities have begun but have not been completed ... by ordering [d]efendants to take all actions necessary to complete those lead-based paint activities in the manner required by TSCA and EPA regulations." (Docket No. 33, Prayer For Relief, ¶ 2.)

Insofar as this relief is sought with respect to ongoing and future abatement activities, it is entirely permissible. However, ongoing and future work were not the only activities plaintiff sought to encompass in this relief. By classifying some of the abatement work—such as that done on the homes of the Arbor Hill members named in the second amended complaint—as "[in]complete," plaintiff did not mean that the workers had not yet finished the tasks assigned to them and still had, for example, some equipment at the homes. Rather, according to plaintiff, because some work had been attempted, abatement activities had begun, and because the ensuing work was allegedly performed improperly, it was not yet completed.

This is clearly an attempt to fit within the directives of the Memorandum–Decision and Order some of the very same relief—an order directing defendants to remedy the improper abatements—that has already been rejected, dressed up in slightly different language. Correctly or not, the past abatement activities of defendants have been "completed," and cannot

therefore be considered "ongoing" so as to come within the scope of the TSCA. As was noted at oral argument, the TSCA authorizes only the restraint, or stoppage, of ongoing activities. Ordering defendants back to the homes where abatement activity has ceased, to do more work, would not be a restraint or a stoppage; it would be ordering an affirmative act. Thus, to the extent this relief seeks to restrain ongoing and future violations of the TSCA, it is permissible; to the extent it seeks to encompass work performed and completed in the past, it is not.[3]

### D.   New Causes of Action

In the second amended complaint, plaintiff asserts three new causes of action, the last two of which were presumably designed to secure relief (an order directing defendants to re-abate homes) held to be unavailable under the TSCA. The first new cause of action—alleging defendant Albany Community Development Agency was not properly certified—is not a subject of the motion to dismiss, and will not therefore be addressed herein. The propriety of the second and third new causes of action—alleging violations of the RLPHRA and CDA pursuant to 42 U.S.C. § 1983, and a third-beneficiary contract claim—however, has been the subject of extensive briefing and will be addressed.

#### 1.   Section 1983 claim

Pursuant to Section 1983, plaintiff claims that defendants had a policy and practice of violating the RLPHRA, and the CDA and its implementing regulations, by failing to adhere to the TSCA standards incorporated therein. Both sides appear to agree that the success of this claim is dependent upon a showing that the relevant statutory provisions create a privately enforceable right. Particularly, three requirements must be satisfied: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) the statute must "impose a binding obligation on the States." *Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *Rodriguez v. DeBuono*, 162 F.3d 56, 60 (2d Cir.1998). If all three requirements are satisfied, "there is a rebuttable presumption that the right is enforceable under Section 1983[,] [and][t]he burden then shifts to the defendant to show that by express provision or other specific evidence from the statute itself [Congress] intended to foreclose such enforcement." *Evac. LLC v. Pataki*, 89 F.Supp.2d 250, 255–56 (N.D.N.Y.2000) (internal quotations and citations omitted). It is here found that the analysis and reasoning in *Santiago ex rel. Muniz v. Hernandez*, 53 F.Supp.2d 264 (E.D.N.Y.1999), are persuasive, and that plaintiff's Section 1983 claims fail as a matter of law.

In *Santiago*, the court held that "neither the . . . [CDA], the RLPHRA, nor their attendant regulations, provide[d][the] plaintiffs with an enforceable right under 42 U.S.C. § 1983 or a private right of action against [the municipality defendant] for its failure to cure the lead-based paint hazards in [the] plaintiffs' home simply because [the municipality defendant] was a recipient of federal funds designed to allow

---

**3.** This is not inconsistent with the holding that plaintiff has established standing through the allegations with respect to the named member(s) of Arbor Hill. The standing analysis is not a determination of the merits of plaintiff's claims, but rather whether plaintiff is even properly before the court. This part of the discussion, on the other hand, is somewhat wrapped up in the merits of the case.

[it] to address such hazards where found in pre–1978 privately owned residences." *Id.* at 266. The court first pointed out that "the [CDA] and RLPHRA were intended to benefit the general public rather than a special class of persons," and that "[t]he Supreme Court has held that being a member of the general public is insufficient to satisfy the intended beneficiary inquiry." *Id.* at 272 (citations omitted).

Even if the plaintiffs could be considered intended beneficiaries of the statutes, the court found that the rights they sought to enforce were vague and amorphous, noting that the activities listed by the statutes as permissible uses of funding were not mandatory. *Id.* at 272–73. The court also noted that "[a] portion of the [CDA] provides an administrative enforcement scheme to address noncompliance for all community development programs, including CDBG funded programs," indicating a Congressional intent that HUD "bear the primary responsibility for ensuring compliance with the [CDA], including the RLPHRA," which was enacted as a part of the CDA. *Id.* at 273 (citing 42 U.S.C. § 5311; 24 C.F.R. §§ 570.910–911, 982.406). The court then rejected the argument that the regulations implementing the statutes provided any enforcement right, noting that such regulations applied only to "HUD-associated housing, . . . not to federal funds expended on lead-based paint activities." *Id.*

Plaintiff contends that the court in *Santiago* took an overly restrictive view of the statutes' policy goals and objectives, and failed to "take pains to analyze the [specific] statutory provisions in detail in light of the entire legislative enactment." (Docket No. 42, p. 11.) Plaintiff then provides an extraordinarily detailed review of the provisions and regulations relating to the two statutes, which "taken together . . . are intended to benefit at-risk, low-income individuals, such as [Arbor Hill's] members and their families, who live in homes where RLPHRA and CDBG-funded lead-based paint activities are conducted, by ensuring that the work is performed safely, reliably, and effectively." *Id.* at 13.

Notwithstanding that the TSCA adequately ensures all of these things, the provisions and regulations quoted by plaintiff are statements relating to the purposes of funding, not mandatory instructions on what a grantee is to do with such funding. Indeed, the specific RLPHRA provision cited by plaintiff in the second amended complaint as providing part of the basis for the Section 1983 claim, 42 U.S.C. § 4852(e)(5), provides that a grant "may be used to . . . ensure that risk assessments, inspections, and abatements are carried out by certified contractors in accordance with Section 2682 of Title 15." The other provision of the RLPHRA cited in the amended complaint, 42 U.S.C. § 4851b, is a definitions section.

While it is true that the Second Circuit has interpreted one provision of the CDA to confer a private enforceable right, *see Chan v. City of N.Y.*, 1 F.3d 96, 106 (2d Cir.1993) (holding that 42 U.S.C. § 5310 grants private right to laborers and mechanics employed with CDA grant money to enforce federally recognized prevailing wage rates), it has cautioned more recently that *Chan* was limited to the one statutory provision there at issue, *see King v. Town of Hempstead*, 161 F.3d 112, 114 (2d Cir. 1998). The court in *King* held that the language of 42 U.S.C. § 5301(c), "an entirely different provision" of the statute which mostly "sets forth general goals for programs funded by [the CDA], including housing code enforcement," was insufficient to create a binding obligation in satisfaction of the third Blessing requirement. *Id.* at 114–15.

Here, the one CDA section cited by plaintiff, 42 U.S.C. § 5304(b)(6), states that before a grant applicant is approved, it must "certify to the satisfaction of the Secretary that ... the grantee will comply with the other provisions of this chapter and with other applicable laws." While the obligation is stated in mandatory terms, it is an obligation of the grantee to the Secretary, not of the grantee to individuals whose homes were or will be abated using CDA funds. Accordingly, under Section 5304, affected persons may challenge HUD's approval of a grant application, *see, e.g., Society Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168 (3d Cir. 2000); *Davis v. U.S. Dep't of Hous. and Urban Dev.,* 627 F.2d 942 (9th Cir.1980); *Fox v. U.S. Dep't of Hous. and Urban Dev.,* 468 F.Supp. 907, 914 (E.D.Pa.1979); *NAACP Santa Rosa Sonoma County Branch v. Hills,* 412 F.Supp. 102 (N.D.Cal. 1976), but not the manner in which the grantee, after approval, uses the funds in its lead-based paint abatement program. Even assuming the federal regulations attendant to the two statutes could alone provide for an enforceable private right,[4] nothing therein changes this conclusion.

The Supreme Court has made clear "that unless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 280, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Such a clear intent has not been manifested in the statutory provisions and regulations cited by plaintiff as the basis for a Section 1983 action in the second amended complaint.

### 2. *Contract claim*

■ In the third new cause of action, plaintiff seeks specific performance of abatements in accordance with federal law and regulations, i.e., to have re-abated homes that were allegedly improperly abated. He claims such performance is a duty owed to Arbor Hill members, as third party beneficiaries to the alleged contracts governing the grants used to fund the lead-based paint abatement program, given to defendants by HUD. Whether this claim is viable depends upon whether the grant agreements can be considered "contracts," and, if so, whether the members of Arbor Hill are third-party beneficiaries of such contracts.

It is here found that whether the grant agreements are properly considered contracts, or the members of Arbor Hill third-party beneficiaries, are largely irrelevant inquiries, as there already exists direct contracts between such members and the contractors that actually performed the abatement work. Plaintiff claims that it is primarily concerned with getting the work done properly, and it would appear that the straightest path to resolving that concern is an action premised on those direct contracts, rather than the massive end-around plaintiff attempts to employ in the apparently never-ending quest to maintain litigation against these particular defendants.

4. Some courts have held that a regulation, by itself, cannot create a federally enforceable Section 1983 right without at least implicit recognition of such right in the regulation's enforcing statute. *See Save Our Valley v. Sound Transit,* 335 F.3d 932, 939 (9th Cir. 2003); *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 274 F.3d 771, 784 (3d Cir.2001); *Harris v. James,* 127 F.3d 993, 1008 (11th Cir.1997); *Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987). Other courts have held that a regulation can itself provide for an enforceable federal right. *See Loschiavo v. City of Dearborn,* 33 F.3d 548 (6th Cir.1994); *Samuels v. Dist. of Columbia,* 770 F.2d 184 (D.C.Cir.1985). The Second Circuit has yet to weigh in on this issue. *See King,* 161 F.3d at 115 (declining to endorse a view).

■ In addition, just because members of Arbor Hill benefit by virtue of the grant agreements being executed properly does not automatically mean that they have enforceable rights pursuant to such agreements. As a general rule, "a party who contracts with a government agency to do an act or render a service is generally not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform," unless the agreement provides for such liability. *Guardians Ass'n v. Civil Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 603 n. 24, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (plurality opinion, J. White). The terms of the grant agreements here do not provide for such liability.

■ Rather, the terms essentially require defendants, in order to receive federal funding, to comply with federal law when utilizing those funds. " '[M]ake whole' remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its 'power under the Spending Clause to place conditions on the grant of federal funds.' " *Id.* at 595, 103 S.Ct. 3221 (quoting *Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). If the grant recipient is unable or unwilling to comply, HUD is the entity with recourse against the grantee on the basis of the grant agreement. Giving such recourse to the tail-end homeowners who eventually have their homes abated under the programs funded by the grants, however, "is an entirely different matter." *Id.* at 603 n. 24, 103 S.Ct. 3221.

Instead, as noted, these homeowners have their proper recourse through the individual contracts they enter into with the contractors hired by defendants to do the abatement work. Why plaintiff refuses—to the tune of filing three complaints and enduring two motions to dismiss without even getting to discovery—to acknowledge this is beyond comprehension. Even defendants have suggested such a course of action, as well as other potential avenues of recourse, such as tort actions or breach of warranty claims. *See* Docket No. 40, p. 25 n. 10; Docket No. 48, pp. 7–9. Indeed, defendants have conceded that there are "lots" of such cases on the state court dockets "all the time." *Id.* at 9. Though no opinion is here expressed as to the propriety or chance of success of such claims, it would appear those types of claims would benefit the members most likely to be injured by past TSCA violations than would this case.

In fact, notwithstanding that plaintiff's TSCA claim survives defendants' motion to dismiss in a limited respect, serious, serious doubts are here expressed as to who is really benefitting from this lawsuit. The only relief that can be had here in federal court is an injunction against ongoing and future violations of the TSCA. Though it casts aspersions on the value of the statute beyond its role as a mere procedural guide for how to conduct abatement activities, relief for past violations of the statute, if proven, is simply not available. Even if it is assumed that plaintiff was unaware of this before initially filing suit, such legal ignorance was most certainly eradicated through the Memorandum–Decision and Order dismissing the original complaint.

It is indeed a laudable goal to ensure that defendants are complying, both in the present and in the future, with the statutes governing lead-based paint abatement activities. However, it seems fairly safe to assume that this lawsuit was prompted by the concerns, expressed or solicited, of families who already had abatement work performed in and around their homes. It is the welfare of people living in homes where the abatement work was allegedly improperly performed—people such as the

Bennetts and the other five named members of Arbor Hill in the second amended complaint—that presumably (and hopefully) served as the catalyst for this lawsuit. Such assumptions are indeed backed up by the relief that was sought in the original complaint—to have allegedly improper abatements fixed and the people affected medically monitored.

That being the case, it is difficult to conceive of how this lawsuit, here in federal court, through the causes of action asserted, will in any way benefit the alleged victims of past violations. True, such people may well feel vindication of some sort that, assuming substantive statutory violations are proven, those who follow them will avoid living in an unsafe environment. That, however, will do nothing to ease the fears and concerns over lead hazards that still exist in their own homes. It will do nothing to ensure that their own present exposure to lead does not lead to serious medical danger. If it is the principle of the matter that is nonetheless relevant, plaintiff hardly needs a court order instructing defendants to comply with the law.

Nevertheless, under the law, plaintiff may be entitled to injunctive relief with respect to ongoing and future violations of the TSCA. Accordingly, assuming plaintiff is able to survive even more motion practice at summary judgment, he will be permitted to prove that the alleged violations are *presently ongoing.* If plaintiff so proves the violations, he will be entitled to a declaration that defendants are foreclosed from continuing lead-based paint abatement activities in violation of federal law.

## IV. CONCLUSION

In the second amended complaint, plaintiff has cured the standing-related defects that plagued the original complaint. However, any order directing defendants to re-abate homes (assuming the substantive violations are proven) is beyond the scope of relief offered by the TSCA. Plaintiff also cannot maintain the Section 1983 and third-party beneficiary contract claims.

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss the second amended complaint is GRANTED in part and DENIED in part;

2. The *sixth* and *seventh* causes of action, and all relief requested incident thereto, and paragraph two in the Prayer for Relief to the extent it encompasses abatement work already completed, are DISMISSED;

3. Dismissal of the *first, second, third, fourth,* and *fifth* causes of action is DENIED; and

4. Defendant shall file and serve an answer to the *first, second, third, fourth,* and *fifth* causes of action on or before February 20, 2004.

IT IS SO ORDERED.